Centurion v. Sessions

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2016

(Argued: February 28, 2017    Decided: June 21, 2017)

Docket No. 15-516

_____

CHARLES WILLIAM CENTURION,

*Petitioner*,

—v.—

JEFFERSON B. SESSIONS III, UNITED STATES ATTORNEY GENERAL,

*Respondent*.

_____

B e f o r e :

KATZMANN, *Chief Judge*, POOLER and LYNCH, *Circuit Judges*.

_____

Petitioner Charles William Centurion, a lawful permanent resident of the United States, was placed in removal proceedings after a brief 2007 trip to the Dominican Republic because of a drug offense he committed in Texas in 1990. The drug offense was not finally adjudicated until 2007. Between the date of the commission of Centurion's crime and the date of its final adjudication, Congress

passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Prior to IIRIRA's passage, lawful permanent residents who left the United States for brief trips were not subject to formal admission procedures upon their return to the United States. After IIRIRA's passage, certain lawful permanent residents returning to the United States from a brief trip abroad must seek formal admission to the United States. Invoking *Vartelas v. Holder*, 566 U.S. 257 (2012), and the presumption against retroactive legislation, Centurion claims that because he committed his drug offense prior to IIRIRA's passage, he should not have been forced to seek admission to the United States after his brief vacation to the Dominican Republic in 2007. We agree and conclude that the Board of Immigration Appeals ("BIA") should evaluate Centurion's motions to reopen his removal proceedings and to stay his removal under the law in effect at the time of the commission of Centurion's 1990 drug offense.

Accordingly, we **GRANT** the petition for review, **VACATE** the BIA's January 27, 2015 order, and **REMAND** the case to the BIA for further proceedings consistent with this opinion.

_____

ALINA CHARNIAUSKAYA (Theodore N. Cox, *on the brief*), Law Office of Theodore N. Cox., New York, NY *for Petitioner*.

SABATINO F. LEO, Trial Attorney (Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and Anthony P. Nicastro, Assistant Director, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Civil Division, Washington, DC *for Respondent*.

_____

KATZMANN, *Chief Judge*:

In this case, we are called on to determine whether the presumption against retroactive legislation bars the application of an immigration statute.

After Petitioner Charles William Centurion committed a drug crime but before Centurion's crime was adjudicated, Congress passed a statute with immigration

consequences for any lawful permanent resident who "has committed" a drug crime. 8 U.S.C. § 1101(a)(13)(C)(v). The question is whether the statute can be given effect with respect to Centurion's crime, even though Centurion committed the crime before the statute's passage. We conclude that the presumption against retroactive legislation bars such an application because the plain text of the statute attaches legal consequences at the time a lawful permanent resident commits a crime, rather than at the time of conviction.

## BACKGROUND

Petitioner Charles William Centurion is a native and citizen of Peru. On November 4, 1989, he became a lawful permanent resident of the United States. In 1990, Centurion was arrested and charged in the Criminal District Court for Dallas County, Texas with conspiracy to possess cocaine. Centurion posted bail and fled the state. His Texas criminal case remained unresolved for seventeen years.

During Centurion's years as a fugitive, Congress took two legislative actions material to his case. To fully describe the import of these actions on Centurion's case, it is necessary to explain some general principles of immigration law. First, the Attorney General formerly enjoyed the discretion,

3

under certain circumstances, to waive the deportation of aliens under § 212(c) of the Immigration and Nationality Act ("INA"). An alien subject to deportation could apply for such a waiver, which was generally known as "212(c) relief." *See* INA § 212(c), 8 U.S.C. § 1182(c) (repealed 1996). The first Congressional action material to Centurion's case was the repeal of INA § 212(c): in 1996, through the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 440(d), 110 Stat. 1214, 1276–77, and then IIRIRA, Pub.L. No. 104-208, § 304(b), 110 Stat. 3009, 3009-597, Congress narrowed and ultimately eliminated § 212(c) relief and replaced it with cancellation of removal, 8 U.S.C. § 1229b(a).

The second Congressional action material to Centurion's case concerned the *Fleuti* doctrine. Under *Rosenberg v. Fleuti*, 374 U.S. 449 (1963), a lawful permanent resident of the United States was not subject to exclusion proceedings, the pre-IIRIRA analogue to removal proceedings for an alien seeking entry into the United States, if the lawful permanent resident's departure from the United States was "an innocent, casual, and brief excursion." *Id.* at 462. In other words, lawful permanent residents could come and go from the United States on short trips without formally seeking admission. Through the passage of

IIRIRA in 1996, Congress ended the *Fleuti* doctrine. *See Vartelas v. Holder*, 620 F.3d 108, 116–18 (2d Cir. 2010) ("*Vartelas I*"), *rev'd on other grounds*, 566 U.S. 257 (2012).[1] Thus, "lawful permanent residents returning post-IIRIRA . . . may be required to seek an admission into the United States, without regard to whether the alien's departure from the United States might previously have been ranked as brief, casual, and innocent under the *Fleuti* doctrine." *Vartelas v. Holder*, 566 U.S. 257, 262–63 (2012) ("*Vartelas II*") (internal quotation marks and brackets omitted). In other words, under 8 U.S.C. § 1101(a)(13)(C)(v), a lawful permanent resident must seek formal admission—even if returning from a brief trip abroad—if he has committed a drug offense or a crime of moral turpitude. In turn, a lawful permanent resident who has been convicted of or who admits committing a drug offense or a crime of moral turpitude is inadmissible. 8 U.S.C. § 1182(a)(2)(A)(i).

---

[1] As will be discussed in greater detail below, the Supreme Court overruled *Vartelas I* in part. Contrary to our decision in *Vartelas I*, the Supreme Court held that IIRIRA could not be applied retroactively to deprive Vartelas of the *Fleuti* doctrine. *Vartelas v. Holder*, 556 U.S. 257, 275–76 (2012) ("*Vartelas II*"). The Court left untouched the portion of our decision in which we deferred to the BIA and held that IIRIRA overruled the *Fleuti* doctrine. Indeed, it explicitly "assume[d], but [did] not decide, that IIRIRA's amendments to § 1101(a)(13)(A) abrogated *Fleuti*." *Vartelas II*, 566 U.S. at 262 n.2. Thus, we adhere to the portion of our decision in *Vartelas I* that remains good law, as we would in any event, since the BIA's determination that IIRIRA overruled *Fleuti* was reasonable. *See In re Collado-Munoz*, 21 I. & N. Dec. 1061, 1065 (BIA 1998). Moreover, since both *Vartelas* decisions were issued, we have recognized in dicta that "IIRIRA superseded *Fleuti*." *Nuñez Peña v. Lynch*, 823 F.3d 756, 758 (2d Cir. 2016).

Because of these two changes—the elimination of § 212(c) relief and the end of the *Fleuti* doctrine—Centurion faced a significantly different immigration law landscape when, in 2005, he was arrested in Puerto Rico on an outstanding warrant from his 1990 Texas drug offense. After his release from custody, Centurion went to Texas to resolve his criminal case. On April 10, 2007, he pleaded *nolo contendere* to conspiracy to possess cocaine in violation of Texas Health and Safety Code § 481.115 and received six months of community supervision. After Centurion complied with the terms of his probation, the proceedings against him in Texas criminal court were dismissed.

On September 25, 2007, the Department of Homeland Security ("DHS") questioned Centurion as he attempted to enter the United States after a brief vacation in the Dominican Republic. During this questioning, Centurion admitted that he was an alien and informed DHS of his 1990 arrest in Texas and his 2005 arrest in Puerto Rico. On January 18, 2008, Centurion was served with a Notice to Appear stating he was subject to removal pursuant to INA § 212(a)(2)(A)(i)(II), 8 U.S.C. § 1182(a)(2)(A)(i)(II), because he was alien convicted of a controlled substance offense, namely conspiracy to possess cocaine.

On May 19, 2009, an Immigration Judge ("IJ") pretermitted Centurion's application for § 212(c) relief and ordered him removed. Specifically, the IJ relied on *INS v. St. Cyr*, 533 U.S. 289 (2001), and *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994), to conclude that § 212(c) relief was unavailable to Centurion because he pleaded *nolo contendere* to his drug offense on April 10, 2007, years after IIRIRA came into effect. On June 23, 2011, the BIA dismissed Centurion's appeal from the IJ's decision. This Court dismissed Centurion's petition for review of the BIA's decision, holding "that the legal regime in force at the time of an alien's conviction determines whether an alien is entitled to seek § 212(c) relief." *Centurion v. Holder*, 755 F.3d 115, 124 (2d Cir. 2014) ("*Centurion I*").

On October 23, 2014, Centurion filed a motion before the BIA to reopen and terminate his removal proceedings and to stay his removal. Centurion argued that the untimeliness of his motion to reopen should be excused because of an intervening change in the law, namely the Supreme Court's decision in *Vartelas II*, 566 U.S. 257 (2012). In *Vartelas II*, the Court held that, to the extent that IIRIRA eliminated the *Fleuti* doctrine, this elimination did not apply to a lawful permanent resident who had committed and been convicted of a crime of moral turpitude before IIRIRA's passage. *Id.* at 272. In other words, the Court held that

7

a lawful permanent resident with a pre-IIRIRA conviction could re-enter the United States after a brief trip abroad without seeking admission. The *Vartelas II* Court observed that "courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Id.* at 266. Requiring a lawful permanent resident who had only briefly travelled abroad to seek formal admission to the United States and thereby be deemed inadmissible as a result of a crime fully adjudicated before IIRIRA's passage would give IIRIRA impermissibly retroactive effect. *See id.* at 267. In his motion to reopen, Centurion argued that his criminal conduct, like that of the petitioner in *Vartelas II*, pre-dated IIRIRA and thus he should not have been forced to formally seek admission to the United States or been placed in removal proceedings after his brief 2007 vacation. In other words, he claimed that he was entitled to avail himself of the *Fleuti* doctrine, as the petitioner was able to do in *Vartelas*.

The BIA denied Centurion's motion to reopen and dismissed his motion to stay as moot. The BIA concluded that the anti-retroactivity holding of *Vartelas II* did not apply to Centurion's case because, although he committed his drug offense prior to IIRIRA's passage, the offense was not finally adjudicated until more than a decade after IIRIRA's passage. In reaching this conclusion, the BIA

8

relied on a footnote in *Vartelas II* which states that § 1101(a)(13)(C)(v) "appears to advert to a lawful permanent resident who has been convicted of an offense under § 1182(a)(2) (or admits to one)." *Id.* at 275 n.11. Centurion filed the present petition for review of the BIA's denial of his motion to reopen.

## DISCUSSION

The question presented by Centurion's petition is whether the Supreme Court's holding in *Vartelas II* that a lawful permanent resident with a conviction pre-dating IIRIRA need not formally seek admission after a brief trip abroad applies when a lawful permanent resident's criminal conduct occurred prior to IIRIRA's passage but the offense was not finally adjudicated until after IIRIRA's passage. Before proceeding to this question, we note the limitations of our jurisdiction.

First, when reviewing a final order of removal against an alien who is inadmissible because of a drug offense, we have jurisdiction to review only constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(C), (D).

Second, Centurion's motion to reopen his removal proceedings was untimely because it was filed more than ninety days after the issuance of his final administrative order of removal. *See* 8 U.S.C. §§ 1101(a)(47)(B), 1229a(c)(7)(C)(i).

The motion's untimeliness was not excused by any regulatory exception. *See* 8 C.F.R. § 1003.2(c)(3). In such circumstances, Centurion's "motion to reopen could only be considered upon exercise of the [BIA]'s *sua sponte* authority." *Mahmood v. Holder*, 570 F.3d 466, 469 (2d Cir. 2009). We do not have jurisdiction to review the BIA's "entirely discretionary" refusal to reopen a case *sua sponte*. *Ali v. Gonzales*, 448 F.3d 515, 518 (2d Cir. 2006) (per curiam). However, we do have jurisdiction to address the narrow question of whether the BIA "misperceived the legal background and thought, incorrectly, that a reopening would necessarily fail." *Mahmood*, 570 F.3d at 469. In denying Centurion's motion to reopen, the BIA set out its understanding that "[f]or *Vartelas* [*II*] to apply to an alien's case, . . . not just the offense, but also the plea and conviction must be pre-IIRIRA." Cert. Admin. Record 4. Under this interpretation of *Vartelas II*, Centurion's motion to reopen would necessarily fail. Therefore, we have jurisdiction to review whether the BIA's understanding of *Vartelas II* was correct.[2]

---

[2] However, we emphasize that, on remand, the BIA could choose not to exercise its *sua sponte* authority to reopen Centurion's removal proceedings, regardless of the correct meaning of *Vartelas II*. *See Mahmood*, 570 F.3d at 471. Such a decision would not be subject to our review. *Id.*

10

Because the correct interpretation of *Vartelas II* is a question of law, we review it *de novo. See Chambers v. Office of Chief Counsel*, 494 F.3d 274, 277 (2d Cir. 2007).

I.

We begin with the presumption against retroactive legislation. "The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf*, 511 U.S. at 265.

In *Landgraf*, the Supreme Court set out a two-step framework for determining when the presumption against retroactive legislation bars application of a statute. *See id.* at 280. The first step is to determine whether Congress expressly provided that a statute should apply retroactively. *Id.* We need not dwell on this first step because the *Vartelas II* Court held that "Congress did not expressly prescribe the temporal reach of . . . 8 U.S.C. § 1101(a)(13)." 566 U.S. at 267. Proceeding to the second step of the *Landgraf* framework, "[t]he

11

essential inquiry . . . is 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Id.* at 273 (quoting *Landgraf*, 511 U.S. at 270). To conduct this inquiry, courts engage in a "process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Landgraf*, 511 U.S. at 270. In this process, "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.*

We do not write on a blank slate because the Supreme Court concluded in *Vartelas II* that 8 U.S.C. § 1101(a)(13)(C)(v) does not apply to an alien convicted of a relevant crime before IIRIRA's enactment. It is clear that § 1101(a)(13)(C)(v) "attaches new legal consequences to events completed before its enactment." *Vartelas II*, 566 U.S. at 273 (quoting *Landgraf*, 511 U.S. at 270). The question now at hand is *when* these new consequences attach. Do they attach when an alien engages in criminal conduct or only once the offense has been adjudicated?

To answer this question, we must construe § 1101(a)(13)(C)(v). "Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well." *United States v. Razmilovic*, 419 F.3d 134, 136 (2d Cir. 2005). Section 1101(a)(13)(C)(v) states that "[a]n alien lawfully admitted for permanent

12

residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . has committed an offense identified in section 1182(a)(2) of this title." We discern no ambiguity in this provision. The plain text of § 1101(a)(13)(C)(v) requires a lawful permanent resident to seek formal admission if he "has committed" an offense. *Id.* The legal consequences of § 1101(a)(13)(C)(v) attach at the time of an alien's criminal conduct. To test and ensure the soundness of our conclusion that a statutory provision is unambiguous, it is prudent to examine those words in the context of the larger statutory structure and related statutory provisions.

Our interpretation of § 1101(a)(13)(C)(v) is consistent with our long-standing interpretation of a related statutory provision. Under 8 U.S.C. § 1229b(a), the Attorney General may cancel the removal of aliens who satisfy certain conditions, including that they have resided in the United States continuously for seven years. However, such a "period of continuous residence . . . in the United States shall be deemed to end . . . when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States." 8 U.S.C. § 1229b(d)(1). This is known as the "stop-time rule." We have repeatedly held that "the date of the commission of

the offense[,]" not the date of conviction, triggers the stop-time rule. *Baraket v. Holder*, 632 F.3d 56, 60 (2d Cir. 2011) (per curiam); *see Martinez v. INS*, 523 F.3d 365, 369 (2d Cir. 2008); *Reid v. Gonzales*, 478 F.3d 510, 512 (2d Cir. 2007) (per curiam); *Tablie v. Gonzalez*, 471 F.3d 60, 62 (2d Cir. 2006). The holdings of these cases rest on the language of § 1229b(d)(1), specifically the "natural meaning," *Baraket*, 632 F.3d at 60, of the phrase "when the alien *has committed* an offense," 8 U.S.C. § 1229b(d)(1) (emphasis added). The relevant language in §§ 1101(a)(13)(C)(v) and 1229b(d)(1) is identical, and we see no reason to deviate from our past interpretation of it here.

We also note that in various statutory provisions, including § 1229b, Congress has expressly required an alien to have been convicted of an offense for specific consequences to attach. For example, under 8 U.S.C. § 1229b(a)(3), "[t]he Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien . . . has not been *convicted* of any aggravated felony." (emphasis added); *see also id.* § 1229b(b)(1)(C) ("The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien . . . has not been *convicted* of an offense under

14

[certain sections] of this title . . . ." (emphasis added)); *id.* § 1182(h) ("No waiver shall be provided under this subsection in the case of an alien who has been *convicted* of (or who has admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture." (emphasis added)). These provisions demonstrate that when Congress intends legal consequences to attach only at the time of adjudication of a crime, Congress will use language to specifically communicate that timing.

The government's arguments against the plain text of § 1101(a)(13)(C)(v) fall short. First, the government points out that, although the text of § 1101(a)(13)(C)(v) does not specifically mention convictions, the text of 8 U.S.C. § 1182(a)(2), to which § 1101(a)(13)(C)(v) refers, does. 8 U.S.C. § 1182(a)(2)(A)(i) states in relevant part that "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance . . . is inadmissible." Although § 1182(a) does expressly attach legal consequences to a conviction or admission rather than the commission of a crime, the government's argument

overlooks the role of § 1182(a) in § 1101(a)(13)(C)(v). Section 1101(a)(13)(C)(v)

forces a lawful permanent resident to seek admission when he "has committed

an offense *identified* in section 1182(a)(2) of this title." 8 U.S.C. § 1101(a)(13)(C)(v)

(emphasis added). The sole purpose of § 1182(a) in § 1101(a)(13)(C)(v) is to

identify a category of crimes, including drug offenses, the commission of which

triggers certain legal consequences. The mention of convictions in § 1182(a) does

not bear directly on § 1182(a)'s identification of crimes and so sheds little light on

the question at hand.

Second, the government argues that we must defer to the BIA's reading of

§ 1101(a)(13)(C)(v). It is true that "the BIA's interpretations of ambiguous

provisions of the INA are owed substantial deference unless 'arbitrary,

capricious, or manifestly contrary to the statute.'" *Mardones v. McElroy*, 197 F.3d

619, 624 (2d Cir. 1999) (quoting *Chevron, U.S.A, Inc. v. Nat. Resources Def. Council,

Inc.*, 467 U.S. 837, 844 (1984)). However, "[i]f the intent of Congress is clear, that

is the end of the matter; for the court, as well as the agency, must give effect to

the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

Section 1101(a)(13)(C)(v) is not ambiguous. It states clearly that lawful

permanent residents must submit to admission proceedings if they have

16

"committed an offense identified in section 1182(a)(2) of this title." 8 U.S.C. § 1101(a)(13)(C)(v). We do not owe the BIA any deference in the interpretation of this unambiguous language.

Third, the government argues that, despite what the plain text of § 1101(a)(13)(C)(v) might say, in practice the consequences of § 1101(a)(13)(C)(v) will only attach upon an alien's conviction of a crime. Specifically, the government observes that an official at the border will ordinarily have no way of knowing whether a lawful permanent resident has committed a crime unless he has been convicted of one. As the Supreme Court memorably put it: "Ordinarily, to determine whether there is clear and convincing evidence that an alien has committed a qualifying crime, the immigration officer at the border would check the alien's records for a conviction. He would not call into session a piepowder court to entertain a plea or conduct a trial." *Vartelas II*, 566 U.S. at 275 (footnote omitted).[3] We do not doubt the wisdom of this insight into the practical application of § 1101(a)(13)(C)(v). However, regardless of the difficulties inherent in applying a statute as written, we are bound by its text. *See United States v.*

---

[3] "Piepowder ('dusty feet') courts were temporary mercantile courts held at trade fairs in Medieval Europe; local merchants and guild members would assemble to hear commercial disputes. These courts provided fast and informal resolution of trade conflicts, settling cases while the merchants' feet were still dusty." *Vartelas II*, 566 U.S. at 275 n.12 (internal quotation marks omitted).

*Messina*, 806 F.3d 55, 67 (2d Cir. 2015) ("[W]e first consider whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. If it does, that meaning controls without need for further inquiry." (internal quotation marks and citation omitted)). Accordingly, for purposes of the retroactivity analysis in this case, the legal consequences of a lawful permanent resident's commission of a drug offense attach at the time of commission, even if, in practice, those consequences may not be enforceable in any meaningful way until after the lawful permanent resident is convicted of the crime.

Because § 1101(a)(13)(C)(v) attaches legal consequences to the commission of drug offenses and Centurion committed his Texas drug offense in 1990, six years prior to IIRIRA's passage, § 1101(a)(13)(C)(v) "attache[d] new legal consequences to events completed before its enactment.'" *Vartelas II*, 566 U.S. at 273 (quoting *Landgraf*, 511 U.S. at 270). Therefore, § 1101(a)(13)(C)(v) cannot be applied to Centurion without violating the presumption against retroactive legislation. This means that the *Fleuti* doctrine should apply to Centurion's five-day vacation to the Dominican Republic in 2007. *See id.* at 275.

## II.

The government also raises a series of arguments that past decisions of the Supreme Court and of this Court require us to deny Centurion's petition. With respect to the Supreme Court, the government claims that we are bound by *Vartelas II* to deny Centurion's petition. The government understands *Vartelas II* to hold that the *Fleuti* doctrine does not apply if a lawful permanent resident merely committed but was not convicted of a relevant crime prior to IIRIRA's enactment. *Vartelas II* contains no such holding. As we explained in *Centurion I*, "*Vartelas* [*II*] did not turn on a distinction between the date of the offense and the date of conviction: the Supreme Court had no occasion to consider the issue in that case because both events, offense and conviction, took place pre-IIRIRA." 755 F.3d at 123. The petitioner in *Vartelas II* had been convicted of conspiracy to make a counterfeit security in 1994, two years prior to IIRIRA's passage. *Vartelas II*, 566 U.S. at 260. Therefore, to the extent the *Vartelas II* Court discussed in passing in a footnote whether the date of commission or conviction of a crime triggered its retroactivity analysis, we think this discussion was meant to alert us to some of the interpretive and practical challenges posed by § 1101(a)(13)(C)(v), but not to definitively resolve them.

19

The government also claims that our own past decisions foreclose Centurion's present petition. However, the decisions on which the government relies, *Centurion I* and *Domond v. INS*, 244 F.3d 81 (2d Cir. 2001), concerned AEDPA and IIRIRA's limitation and elimination of § 212(c) relief, not IIRIRA's elimination of the *Fleuti* doctrine. Crucially, in the § 212(c) context, "[i]t [was] the conviction, not the underlying criminal act, that trigger[ed] the disqualification from § 212(c) relief." *Domond*, 244 F.3d at 85–86 (quoting *St. Cyr v. INS*, 229 F.3d 406, 418 (2d Cir. 2000)) (internal quotation marks omitted). In the present context, the underlying criminal act triggers the necessity of applying for readmission into the United States. As such, *Centurion I* and *Domond* do not control the present case.

To fully explain the limited relevance of *Centurion I* and *Domond* to our present decision, it is necessary to chart the trajectory of judicial decisions following the passage of AEDPA and IIRIRA. AEDPA barred aliens who had committed certain crimes from receiving relief under § 212(c), and IIRIRA then repealed § 212(c) altogether. *See* AEDPA, Pub. L. No. 104-132, § 440(d), 110 Stat. 1214, 1277; IIRIRA, Pub. L. No. 104-208, § 304(b), 110 Stat. 3009, 3009-597. In *INS v. St. Cyr*, 533 U.S. 289 (2001), the Supreme Court held that AEDPA and IIRIRA's

20

limitation and elimination of § 212(c) relief did not apply to aliens convicted of relevant crimes before the passage of AEDPA and IIRIRA. *Id.* at 326. In other words, such persons could still make use of § 212(c). In *Domond*, this Court clarified that AEDPA's limitations on § 212(c) relief did apply if an alien only committed the relevant offense before AEDPA's passage, but was convicted of the offense after AEDPA's passage. 244 F.3d at 85–86.

Because *Domond* barred Centurion from seeking § 212(c) relief, Centurion argued on his prior appeal that *Domond* did not survive the Supreme Court's decision in *Vartelas II*. In *Centurion I*, this Court held that *Domond* survived *Vartelas II* because *Vartelas II* did not address whether the date of commission or the date of conviction of a crime was the key date for retroactivity purposes. *Centurion I*, 755 F.3d at 123. *Centurion I* does not directly control the outcome of this case because *Centurion I* concerned the retroactivity of the elimination of § 212(c) relief, not the retroactivity of § 1101(a)(13)(C)(v). In addition, the reasoning of *Centurion I* is not applicable here because *Centurion I* did not decide the retroactivity issue as a matter of first impression. *Centurion I* focused on whether *Vartelas II* had *sub silentio* overruled a binding Second Circuit precedent, *Domond*, rather than on the underlying question of the crucial date for a

21

retroactivity analysis. There is no controlling precedent analogous to *Domond* that resolves the retroactivity issue with respect to § 1101(a)(13)(C)(v), as opposed to the repeal of § 212(c).

Although *Centurion I* is of only minimal relevance to our present decision, the reasoning of *Domond* is applicable. However, *Domond*'s insights play out differently in the § 1101(a)(13)(C)(v) context than in the § 212(c) context. Specifically, our holding in *Domond* that the date of conviction was the key date for retroactivity purposes in the § 212(c) context rested on three key points. Each cuts the other way in the present context. First and most importantly, in *Domond*, we observed that "[i]t is the conviction, not the underlying criminal act, that triggers the disqualification from § 212(c) relief." 244 F.3d at 85–86 (quoting *St. Cyr*, 229 F.3d at 418) (internal quotation marks omitted). By contrast, in the present case, the plain language of § 1101(a)(13)(C)(v) attaches consequences when a lawful permanent resident "has committed an offense."

Second, in *Domond*, we stated that "waivers available from [§] 212(c) hearings were purely discretionary. Therefore, loss of the [§] 212(c) hearings, while clearly a hardship, does not impose a new legal consequence on [petitioner's] pre-AEDPA conduct." 244 F.3d at 86. Unlike the loss of purely

discretionary § 212(c) relief, § 1101(a)(13)(C)(v) imposes definite new legal consequences, not attenuated hardships, on lawful permanent residents. Without § 1101(a)(13)(C)(v) a lawful permanent resident who has committed certain crimes would "not be regarded as seeking an admission into the United States for purposes of the immigration laws" upon reentry, but under § 1101(a)(13)(C)(v) the same lawful permanent resident is regarded as seeking admission to the United States (and is deemed inadmissible under 8 U.S.C. § 1182(a)(2)). 8 U.S.C. § 1101(a)(13)(C).

Third, in *Domond*, we concluded that any reliance interests were minimal: "'[i]t would border on the absurd to argue' that [petitioner] would have decided not to commit a crime if he had known that he not only could be imprisoned, but also could face deportation without the availability of a discretionary waiver of deportation." 244 F.3d at 86 (first alteration in original) (quoting *St. Cyr.*, 229 F.3d at 418). We reiterated this view in our opinion in *Vartelas I*, 620 F.3d at 120 (quoting *St. Cyr.*, 229 F.3d at 418) (citing *Domond*, 244 F.3d at 86). However, in its opinion in *Vartelas II*, the Supreme Court specifically overturned our assessment of the likelihood of an alien's reliance on immigration law when choosing to commit a crime. *See* 566 U.S. at 272–75. The *Vartelas II* Court stated that the

23

*Vartelas II* petitioner "likely relied on [pre-IIRIRA] immigration law." *Id.* at 273.

Moreover, the Court explained that reliance interests were not "essential to the

application of the retroactivity principle." *Id.* at 275. To the extent that reliance

interests are relevant, Centurion is similarly situated to the petitioner in *Vartelas*

*II*: he might have been deterred from committing his crime had he known his

conduct would bar him from leaving the United States for a brief trip.

Because each of the three bases of the *Domond* decision weigh in

Centurion's favor in the present context, we reach the opposite conclusion from

*Domond*: § 1101(a)(13)(C)(v) does not apply retroactively as of the date of

commission of a drug offense.

## CONCLUSION

For the foregoing reasons, we **GRANT** the petition for review, **VACATE**

the BIA's January 27, 2015 order, and **REMAND** the case to the BIA for further

proceedings consistent with this opinion.