Opinion concurring in part and dissenting in part filed by Circuit Judge WILKINS.
KAVANAUGH, Circuit Judge:
The separation of powers and statutory interpretation issue that arises again and again in this Court is whether an executive or independent agency has statutory authority from Congress to issue a particular regulation. In this case, we consider whether EPA had statutory authority to issue a 2015 Rule regulating the use of hydrofluorocarbons, known as HFCs.
According to EPA, emissions of HFCs contribute to climate change. In 2015, EPA therefore issued a rule that restricted manufacturers from making certain products that contain HFCs. HFCs have long been used in a variety of familiar products—in particular, in aerosol spray cans, motor vehicle air conditioners, commercial refrigerators, and foams. But as a'result of the 2015 Rule, some of the manufacturers that previously used HFCs in their products no longer may do so. Instead, those manufacturers must use other EPA-approved substances in their products.
As statutory authority for the 2015 Rule, EPA has relied on Section 612 of the Clean Air Act. 42 U.S.C. § 7671k. Section 612 requires manufacturers to replace ozone-depleting substances with safe substitutes.
The fundamental problem for EPA is that HFCs are not ozone-depleting substances, as all parties agree. Because HFCs are not ozone-depleting substances, Section 612 would not seem to grant EPA authority to require replacement of HFCs. Indeed, before 2015, EPA itself maintained that Section 612 did not grant authority to *454 require replacement of non-ozone-depleting substances such as HFCs. But in the 2015 Rule, for the first time since Section 612 was enacted in 1990, EPA required manufacturers to replace non-ozone-depleting substances (HFCs) that had previously been deemed acceptable by the agency. In particular, EPA concluded that some HFCs could no longer be used by manufacturers in certain products, even if the manufacturers had long since replaced ozone-depleting substances with HFCs.
EPA’s novel reading of Section 612 is inconsistent with the,statute as written. Section 612 does not require (or give EPA authority to require) manufacturers to replace non-ozone-depleting substances such as HFCs. We therefore vacate the 2015 Rule to the extent it requires manufacturers to replace HFCs, and we remand to EPA for further proceedings consistent with this opinion.
I
A
In the 1980s, an international movement developed to combat depletion of the ozone layer. Depletion of the ozone layer exposes people to more of the sun’s harmful ultraviolet light, thereby increasing the incidence of skin cancer, among other , harms. The international efforts to address ozone depletion culminated in the Montreal Protocol, an international agreement signed in 1987 by the United States and subsequently ratified by every nation in the United Nations. The Protocol requires signatory nations to regulate the production and use of a variety of ozone-depleting substances. Montreal Protocol on Substances that Deplete the Ozone Layer, opened for signature Sept. 16, 1987, S. Treaty Doc. No. 100-10,1522 U.N.T.S. 29.
Congress implemented U.S.' obligations under the Montreal Protocol by enacting, with President George H.W. Bush’s signature, the 1990 Amendments to the Clean Air Act. Those amendments added a new Title ■ VI to the. Clean Air Act. Title VI regulates ozone-depleting substances.
Title VI identifies two classes of ozone-depleting substances: “class I” and “class II” substances. 42 U.S.C. § 7671a(a), (b). Section 612(a), one of the key provisions of Title VI, requires manufacturers to replace those ozone-depleting substances': “To the maximum extent practicable, class F and class II substances shall be replaced by chemicals, product substitutes,' or alternative manufacturing processes that reduce overall risks to human health and the environment.” Id. § 7671k(a). With a few exceptions, Title VI requires manufacturers to phase out their use of some ozone-depleting substances by 2000, and to phase out their use of other ozone-depleting substances by 2015. Id. §§ 7671c(b)-(c), 7671d(a).
When manufacturers stop using ozone-depleting substances in - their- products, manufacturers may need to replace those substances with a substitute substance. Under Section 612(a), EPA may require 'manufacturers to- use safe substitutes when the manufacturers replace ozone-depleting substances. Id. § 7671k(a).
To implement the Section 612(a) requirement that ozone-depleting substances be replaced with safe substitutes, Section 612(c) requires EPA to publish a list of both safe and prohibited substitutes:
Within 2 years after November 15,1990, the Administrator shall promulgate rules under this section providing that it shall be unlawful to - replace any class I or class II substance with any substitute substance which the Administrator, determines may present adverse effects to human health or the environment, where the Administrator has identified an alternative to such replacement that— -
(1) reduces the overall risk to human health and the environment; and
*455 (2) is currently or potentially available.
The Administrator shall publish a list of (A) the substitutes prohibited under this subsection for specific uses and (B) the safe alternatives identified under this subsection for specific uses.
Id. § 7671k(c). In short, Section 612(c) requires EPA to issue a list of both authorized and prohibited substitute substances based on the safety and availability of the substances.
Importantly, the lists of safe substitutes and prohibited substitutes are not set in stone. Section 612(d) provides: “Any person may petition the Administrator to add a substance to the lists under subsection (c) of this section or to remove a substance from either of such lists.” Id. § 7671k(d). In other words, if EPA' places a substance on the list of safe substitutes, EPA may later change its classification and move the substance to the list of prohibited substitutes (or vice versa).
In 1994, EPA promulgated regulations to implement Section 612(c). See Protection of Stratospheric Ozone, 59 Fed. Reg. 13,044 (Mar. 18, 1994). At the time, EPA indicated that once a manufacturer has replaced its ozone-depleting substances with a non-ozone-depleting substitute, Section 612(c) does not give EPA authority to. require the manufacturer to later replace that substitute with a different substitute. EPA explained that Section 612(c) “does not authorize EPA to review substitutes for substances that are not themselves” ozone-depleting substances covered under Title VI. EPA Response to Comments on 1994 Significant New Alternatives Policy Rule, J.A. 50.
B
Hydrofluorocarbons, known as HFCs, are substances that contain hydrogen, fluorine, and carbon. When HFCs are emitted, they trap heat in the atmosphere. They are therefore “greenhouse gases.” But HFCs do not deplete the ozone layer. As a result, HFCs are not ozone-depleting substances covered by Title VI of the Clean Air Act. Instead, HFCs are potential substitutes for ozone-depleting substances in' certain products.
In 1994, acting pursuant to its authority under Section 612(c), EPA concluded that certain HFCs were safe substitutes for ozone-depleting substances when used in aerosols, motor vehicle air conditioners, commercial refrigerators, and foams, among other things. See Protection of Stratospheric Ozone, 59 Fed. Reg. at 13,-122-46. Over the next decade, EPA added HFCs to the list of safe substitutes for a number of other products. See, e.g., Protection of Stratospheric Ozone: Listing of Substitutes for Ozone-Depleting Substances, 68 Fed. Reg. 4004, 4005 (Jan. 27, 2003); Protection of Stratospheric Ozone; Listing of Substitutes for Ozone-Depleting Substances, 64 Fed. Reg. 22,982, 22,984 (Apr. 28,1999).
As a result, in the 1990s and 2000s, many businesses stopped using ozone-depleting substances in their products. Many businesses replaced those ozone-depleting substances with HFCs. HFCs became prevalent in many products. HFCs have served as propellants in aerosol spray cans, as refrigerants in air conditioners and refrigerators, and as blowing agents that create bubbles in foams.
Over .time, EPA learned more about the effects of greenhouse gases such as HFCs. In 2009, EPA concluded that greenhouse gases may contribute to climate change, increasing the incidence of mortality and the likelihood of extreme weather- events such as floods and hurricanes. See Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,497-98 (Dec. 15, 2009).
*456 In 2013, President Obama announced that EPA would seek to reduce emissions of HFCs because HFCs contribute to climate change. Executive Office of the President, The President’s Climate Action Plan 10 (2013). The President’s Climate Action Plan indicated that “the Environmental Protection Agency will use its authority through the Significant New Alternatives Policy Program” of Section 612 to reduce HFC emissions. Id.
Consistent with the Climate Action Plan, EPA promulgated a Final Rule in 2015 that moved certain HFCs from the list of safe substitutes to the list of prohibited substitutes. Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program, 80 Fed. Reg. 42,870 (July 20, 2015) [hereinafter Final Rule], In doing so, EPA prohibited the use of certain HFCs in aerosols, motor vehicle air conditioners, commercial refrigerators, and foams—even if manufacturers of those products had long since replaced ozone-depleting substances with HFCs. Id. at 42,872-73.
Therefore, under the 2015 Rule, manufacturers that used those HFCs in then-products are no longer allowed to do so. Those manufacturers must replace the HFCs with other substances that are on the revised list of safe substitutes.
In the 2015 Rule, EPA relied on Section 612 of the Clean Air Act as its source of statutory authority. EPA said that Section 612 allows EPA to “change the listing status' of a particülar substitute” based on “new information,” Id. at 42,876. EPA indicated that it had new' information about HFCs: Emerging research demonstrated that HFCs were greenhouse gases that contribute to climate change. See id, at 42,879. EPA therefore concluded that it had statutory authority to. move HFCs from the list of safe substitutes to the list of prohibited substitutes. Because HFCs are now prohibited substitutes, EPA claimed that it could also require the replacement of HFCs under Section 612(c) of the Clean Air Act even though HFCs are not ozone-depleting substances.
Mexichem Fluor and Arkema are businesses that make HFC-134a for use in a variety of products. The 2015 Rule prohibits the use of HFC-134a in certain products. The companies have petitioned for review of the 2015 Rule. They raise two main arguments. First, they argue that the 2015 Rule exceeds EPA’s statutory authority under Section 612 of the Clean Air Act. In particular, they contend that EPA does not have statutory authority to require manufacturers to replace HFCs, which are non-ozone-depleting substances, with alternative substances. Second, they allege that EPA’s decision in the 2015 Rule to remove HFCs from the list of safe substitutes was arbitrary and capricious because EPA failed to adequately explain its decision and failed to consider several important aspects of the problem. We address those arguments in turn.
II
A
We first consider whether Section 612 of the Clean Air Act authorizes the 2015 Rule.
In 1987, the United' States signed the Montreal Protocol. The Montreal Protocol is an international agreement that has been ratified by every nation that is a member of the United Nations. The Protocol requires nations to regulate the production and use of certain ozone-depleting substances. See Montreal Protocol on Substances that Deplete the Ozone Layer, opened for signature Sept. .16, 1987, S. Treaty Doc. No. 100-10, 1522 U.N.T.S. 29.
In 1990, in part to implement U.S. obligations under the Protocol and to regulate *457 the production and use of ozone-depleting substances, Congress added a new Title to the Clean Air Act: Title VI. Among Title Vi’s provisions is Section 612.
Section 612(a) of the Act provides: “To the maximum extent practicable,” ozone-depleting substances that are covered under Title VI “shall be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment.” 42 U.S.C. § 7671k(a). Title VI sets phase-out dates for those ozone-depleting substances. Id. §§ 7671c, 7671d.
To implement Section 612(a), EPA maintains lists of both safe substitutes and prohibited substitutes for ozone-depleting substances. The provision governing those lists, Section 612(c), provides: It “shall be unlawful to replace any” ozone-depleting substance that is covered under Title VI “with any substitute substance” that is on EPA’s list of “prohibited” substitutes. Id. § 7671k(c). A manufacturer that violates Section 612(c) can be subject to substantial civil and criminal penalties. See id. § 7413(b), (c).[1]
In the years since 1990, many manufacturers of the products relevant here— aerosols, motor vehicle air conditioners, commercial refrigerators, and foams— have stopped using ozone-depleting substances in those products. Manufacturers have often replaced those ozone-depleting substances with HFCs that have long been on the list of safe substitutes.
In the 2015 Rule, acting under the authority of Section 612(c), EPA moved some HFCs from the list of safe substitutes to the list of prohibited substitutes. As a result, manufacturers replacing ozone-depleting substances can no longer use those HFCs as a safe substitute. Even more importantly for present purposes, under the Rule, manufacturers that- have already replaced ozone-depleting substances with HFCs can no longer use those HFCs in their products.
In this case, all parties agree that EPA possesses statutory authority to require manufacturers to replace ozone-depleting substances within the timelines specified by Title VI—generally by 2000 for some ozone-depleting substances, and by 2015 for other ozone-depleting substances. See, e.g., 42 U.S.C. §§ 7671c, 7671d. If a substance on the safe substitutes list is later found to be an ozone-depleting substance, EPA possesses direct statutory authority to order the replacement of that ozone-depleting substance in accordance with those statutory timelines.
All parties in this case also agree that EPA may change the lists of safe and prohibited substitutes based on EPA’s assessment. of the risks that those substitutes pose for “human health and the environment.” Id. § 7671k(c); see, id. § 7671k(d). It follows that Section 612(c) allows EPA to move a substitute from the list of safe substitutes to the list of prohibited substitutes. Therefore, assuming that all other statutory criteria are satisfied, EPA. may move HFCs from the list of safe substitutes to the list of prohibited substitutes, as it did in the 2015 Rule,
In addition, all parties agree that, under Section 612(c), EPA may prohibit a manufacturer from replacing an ozone-depleting substance that is covered under Title VI with a prohibited substitute. It follows that EPA may bar any manufacturers that still make products that contain ozone-depleting substances from replacing those ozone-depleting' substances with HFCs. Of course, that aspect of the 2015 Rule is not *458 a big deal as of now because there- are few (if any) manufacturers that still make products ‘that use ozone-depleting - substances.[2]
The key dispute in this ease is whether EPA has authority under Section 612(c) to prohibit manufacturers from making products that contain -HFCs if those manufacturers already replaced ozone-depleting substances with HFCs at a time when HFCs were listed as safe substitutes. In those circumstances, does EPA have authority to require a manufacturer to now replace HFCs, which are non-ozone-depleting substances, with another substitute?
’ For many years, EPA itself stated that it did not possess authority under Section 612(c) to require the replacement of non-ozone-depleting substances. For example, in 1994, EPA explained that Section 612(c) “does not authorize EPA to review substitutes for substances that are not themselves” ozone-depleting substances. EPA Response to Comments on 1994 Significant New Alternatives Policy Rule, J.A. 50. Two years later, EPA reiterated that interpretation: EPA explained that it “does not regulate the legitimate substitution” of oné substance for another “first generation non-ozone-depleting” substance. EPA Response to OZ Technology’s Section 612(d) Petition, J.A. 145.
EPA now argues that it actually possesses such authority under the statute. For the first time, EPA has sought to order the replacement of a non-ozone-depleting substitute that had previously been deemed acceptable by the agency.[3]
' EPA’s new interpretation of Section 612(c) depends on the word “replace.” As noted above, Section 612(c) makes it unlawful to “replace” an ozone-depleting substance that is covered under Title VI with a substitute substance that is on the list of prohibited substitutes. 42 U.S.C. § 7671k(c). EPA recognizes that manufacturers “replace” an ozone-depleting substance when the manufacturers initially replace that ozone-depleting substance with a safe substitute. But EPA argues that the initial substitution is not the only time when manufacturers “replace” an ozone-depleting substance. EPA claims that a manufacturer continues to “replace” the ozone-depleting substance every time the manufacturer uses the substitute substance, indefinitely into the future. According to EPA, replacement is not a one-time occurrence but a never-ending process. In EPA’s view, because manufacturers continue to “replace” ozone-depleting substances with HFCs every time they use HFCs in their products,.EPA continues to have authority to require manufacturers to stop using HFCs and to use a different substitute.
EPA’s current reading stretches the word “replace” beyond its ordinary meaning. As relevant here, the word “replace” means to “take the place of.” The American Heritage Dictionary op the English Language (5th ed. 2017 online); Webster’s' Third New International Dic *459 tionary 1925 (1993); The Oxford English Dictionary 642 (2d ed. 1989). In common parlance, the word “replace” refers to a new thing taking the place of the old. For example, President Obama replaced President Bush at a specific moment in time: January 20, 2009, at 12 p.m. President Obama did not “replace” President Bush every time President Obama thereafter walked into the Oval Office. By the same token, manufacturers “replace” an ozone-depleting substance when they transition to making the same product with a substitute substance. After that transition has occurred, the replacement has been effectuated, and the manufacturer no longer makes a product that uses an ozone-depleting substance. At that point, there is no ozone-depleting substance to “replace,” as EPA itself long recognized.[4]
Under EPA’s current interpretation of the word “replace,” manufacturers would continue to “replace” an ozone-depleting substance with a substitute even 100 years or more from now. EPA would thereby have indefinite authority to regulate a manufacturer’s use of that substitute. That boundless interpretation of EPA’s authority under Section 612(c) borders on the absurd.
Because the text is sufficiently clear, we need not consider the legislative history. See NLRB v. SW General, Inc., — U.S. —, 137 S.Ct. 929, 942, 197 L.Ed.2d 263 (2017). In any event, the legislative history strongly supports our conclusion that Section 612(e) does not grant EPA continuing authority to require replacement of non-ozone-depleting substitutes. The Senate’s version of Title VI applied to “Stratospheric Ozone and Global Climate Protection.” S. 1630, 101st Cong. tit. VII (as passed by Senate, Apr. 3, 1990) (emphasis added). The Senate’s version of the safe alternatives policy would have required the replacement not just of, ozone-depleting substances, but also of substances that contribute to climate change. Id. sec. 702, §§ 503(8)„ 514(a). In other words, the Senate bill would have granted EPA authority to require the replacement of non-ozone-depleting substances such as HFCs. But the Conference Committee did not accept the Senate’s version of Title VI. See H.R. Rep. Ño. 101-952, at 262 (1990) (Conf. Rep.). Instead, the Conference Committee adopted .the House’s narrower focus on ozone-depleting substances. Id.; see S. 1630, 101st Cong. sec. 711, § 156(b) (as passed by House, May 23, 1990). In short, although Congress contemplated giving EPA broad authority under Title VI to regulate the replacement of substances that contribute- to climate change, Congress ultimately declined.
Put simply, EPA’s strained reading of the term “replace” contravenes the statute and thus fails at Chevron step 1. And even if we reach Chevron step 2, EPA’s-interpretation is unreasonable. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 & n.9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also Global Tel*Link v. FCC, 859 F.3d 39, 59-60 (D.C. Cir. 2017) (Silberman, J., concurring).
*460 Notwithstanding our conclusion regarding Section 612, EPA still possesses several statutory authorities to regulate HFCs.
For oné thing, EPA has statutory authority under Section 612(c) to prohibit any manufacturers that still use ozone-depleting substances that are covered under Title VI from deciding in the future to replace those substances with HFCs. Those manufacturers have yet to “replace” ozone-depleting substances with a substitute. When they ultimately do replace ozone-depleting substances, EPA may prohibit them from using HFCs as substitutes.[5]
For another thing, EPA possesses other statutory authorities, including the Toxic Substances Control Act, to directly regulate non-ozone-depleting substances that are causing harm to the environment. See 15 U.S.C. §§ 2601-2629 (Toxic Substances Control Act); see also 42 U.S.C; § 7408 (National Ambient Air Quality Standards program); id. § 7412 (Hazardous Air Pollutants program); id. §§ 7470-7492 (Prevention of Significant Deterioration program); id. § 7521- (Section 202 of Clean Air Act). Our decision- today does not in any way cabin those expansive EPA authorities.
In addition, EPA still has statutory authority to require product manufacturers to replace substitutes that (unlike HFCs) are themselves ozone depleting. See, e.g., 42 U.S.C. §§ 7671c, 7671d. Suppose, for example, that EPA determines that a substance is a safe substitute for ozone-depleting substances, but EPA later concludes that the substitute is itself an ozone-depleting substance that is covered under Title VI. In that circumstance, EPA possesses statutory authority to order the replacement of that ozone-depleting substance in accordance with the timelines prescribed by Title VI.
However, EPA’s authority to regulate ozone-depleting substances under Section 612 and other statutes does not give EPA authority to order the replacement- of substances that are not ozone depleting but that contribute to climate change. Congress has not yet enacted general climate change legislation. Although we understand and respect EPÁ’s overarching effort to fill that legislative void and regulate HFCs, EPA may act only as authorized by Congress. Here, EPA has tried to jam a square peg (regulating non-ozone-depleting substances' that may contribute to climate change) into a round hole (the existing statutory landscape).
The Supreme Court cases that have dealt with EPA’s efforts to address climate change have taught us two lessons that are worth repeating here. See, e.g., Utility Air Regulatory Group v. EPA, — U.S. —, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014). First, EPA’s well-intentioned policy objectives with respect to climate change do not on their own authorize the agency to regulate. The agency must have statutory authority for the regulations it wants to issue. Second, Congress’s failure to enact general climate change legislation does not authorize EPA to act. Under the Constitution, congressional inaction does not license an agency to take matters into its own hands, even to solve a pressing policy issue such as climate change. Justice Breyer has summarized that separation of powers point in another context—there, the war against al Qaeda. See Hamdan v. Rumsfeld, 548 U.S. 557, 636, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Breyer, J., concurring). Justice Breyer stated in *461 Harridan that war is not a blank check for the President. Id.; see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). So too, climate change is not a blank check for the President.
Those bedrock separation of powers principles undergird our decision in this case. However much we might sympathize or agree with EPA’s policy objectives, EPA may act only within the boundaries of its statutory authority. Here, EPA exceeded that authority.
B
EPA’s reliance on the statutory term “replace” does not justify the 2015 Rule. But that is not necessarily the end of the matter. EPA suggests that it may be able to require manufacturers to replace HFCs under an alternative theory. The question under that alternative theory is this: May EPA retroactively conclude that a manufacturer’s past decision to “replace” an ozone-depleting substance with HFCs is no longer lawful, even though the original replacement with HFCs was lawful at the time it was made? Under such a “retroactive disapproval” approach, EPA could prohibit manufacturers from making products that use HFCs even though those HFCs were deemed safe substitutes at the time the manufacturers decided to initially replace an ozone-depleting substance with HFCs.
EPA’s brief to this Court advanced such an argument only in passing. In its brief, EPA stated: An “agency’s inherent authority to revise an earlier administrative determination where faced with new developments or in light of reconsideration of the relevant facts is an essential part of the office of a regulatory agency.” EPA Br. 27 (internal quotation marks omitted).
The problem for present purposes is that EPA did not squarely articulate a “retroactive disapproval” rationale in the 2015 Rule. Instead, EPA relied on its expansive interpretation of the word “replace” in the Rule. Therefore, we may not uphold the Rule based on the “retroactive disapproval” theory. See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947); Pasternack v. National Transportation Safety Board, 596 F.3d 836, 838 (D.C. Cir. 2010).
Rather, we must remand to EPA. On remand, if EPA decides to pursue this “retroactive disapproval” approach, the agency would have to address at least three issues.
First, for this “retroactive disapproval” theory to hold up, EPA would have to reasonably conclude either (i) that Section 612(c) provides EPA with statutory authority to employ a “retroactive disapproval” approach or (ii) that EPA has inherent authority to retroactively disapprove a pri- or replacement, even a replacement that occurred many years ago. See generally Vartelas v. Holder, 566 U.S. 257, 266, 132 S.Ct. 1479, 182 L.Ed.2d 473 (2012) (retro-activity principles in statutory interpretation); Ivy Sports Medicine, LLC v. Burwell, 767 F.3d 81, 86 (D.C. Cir. 2014) (scope of agencies’ inherent reconsideration authority).
Second, if EPA concludes that it has authority for “retroactive disapprovals,” EPA must explain the basis for its conclusion and explain its change in interpretation of Section 612(c). See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). As noted above, before the 2015 Rule, EPA indicated that Section 612(c) “does not authorize EPA to review substitutes for substances that are not themselves” covered ozone-depleting substances. EPA Response to Comments on 1994 Significant New Alternatives Policy Rule, J.A. 50; see Protection of Strato *462 spheric Ozone, 59 Fed. Reg. 13,044, 13,052 (Mar. 18, 1994); EPA Response to OZ Technology’s Section 612(d) Petition, J.A. 145. But under the retroactive disapproval approach, EPA would in effect require manufacturers to replace their HFCs, which are not ozone-depleting substances, with other substitutes. Such a change in EPA’s approach would require an explanation. Moreover, to the extent that EPA’s prior approach had “engendered serious reliance interests,” EPA' would need to provide a “more detailed justification” for its change. Fox, 556 U.S. at 515, 129 S.Ct. 1800.
Third, even if EPA has authority for a “retroactive disapproval” approach, EPA must comply with applicable due process constraints on retroactive decision-making. The Due Process Clause limits the Government’s authority to retroactively alter the legal consequences of an entity’s or person’s past conduct. To satisfy the Due -Process Clause, EPA must at a minimum' “provide regulated parties fair warning of the conduct a regulation prohibits or requires.” Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 156, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) (internal quotation marks and alteration omitted). In this case, -for example; even if EPA-has statutory authority to retroactively disapprove the replacement of an ozone-depleting substance with HFCs, EPA plainly may not impose civil or criminal.'penalties on a manufacturer based on the manufacturer’s past, use of HFCs at the time when EPA said it was lawful to use HFCs. See id. We do not understand EPA to disagree with that proposition.
Unless and until EPA concludes on remand that it has cleared those three hurdles,[6] EPA may not apply the 2015 Rule to require manufacturers to.replace one non-ozone-depleting" substitute with • another substitute, so long as the initial substitute was listed as safe at the time the substitution was effectuated. Of course, even if EPA concludes that it has cleared those hurdles, EPA’s conclusions may be subject to review in this Court in another case.
In short, we vacate the 2015 Rule to the extent the Rule requires manufacturers to replace HFCs with a substitute substance. We remand to EPA. On remand, if it chooses, EPA may determine whether it has “retroactive disapproval” authority— whether, in other words, it has authority to conclude that a manufacturer’s past decision to replace an ozone-depleting substance with HFCs is no longer lawful.
Ill
Our conclusion that the 2015 Rule must be vacated to the extent it requires manufacturers to replace HFCs does not answer the question whether EPA reasonably removed HFCs from the list of sáfe substitutes in the first place. Mexichem and Arkema assert that EPA’s decision to remove HFCs from the list of safe substitutes was arbitrary and capricious. In support, they advance a number of arguments.
The arbitrary and capricious standard requires that a rule be “reasonable and reasonably explained.” Communities for a Better Environment v. EPA, 748 F.3d 333, 335 (D.C. Cir. 2014) (internal quotation marks omitted). EPA must “examine the relevant data and articulate a satisfactory explanation for its action.” Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Applying that deferential standard, we re *463 ject all of Mexichem and Arkema’s arbitrary and capricious challenges,
First, Mexichem and Arkema assert that EPA ignored a key “requirement” in the 1994 Rule implementing Section 612(c)— namely, that EPA may “restrict only those substitutes that are significantly worse” than the available alternatives. Reply Br. 21; Protection of Stratospheric Ozone, 59 Fed. Reg. 13,044, 13,046 (Mar. 18, 1994) (capitalization altered). They claim that EPA did not demonstrate that HFCs are significantly worse than the available alternatives. In fact, however, the 1994 Rule said that restricting significantly worse substitutes was just one of seven “guiding principles” for EPA—not a hard-and-fast requirement. Protection of Stratospheric Ozone, 59 Fed. Reg. at 13,046. Moreover, based on data regarding the environmental effects of the relevant substances, EPA repeatedly concluded that the substances EPA added to the list of prohibited substitutes posed a “significantly greater risk” than the available alternatives. See, e.g., Final Rule, 80 Fed. Reg. at 42,904, 42,905, 42,912, 42,915, 42,917, 42,919. So that challenge fails.[7]
Second, Mexichem and Arkema argue that EPA should not have relied so heavily on the numeric Global Warming Potential score to assess the “Atmospheric effects and related health and environmental impacts” of HFCs and other substitutes. 40 C.F.R. § 82.180(a)(7)(i). But as EPA has explained, that is the tool preferred by leading scientists for analyzing thé effects of greenhouse gases. EPA Response to Comments on Proposed Rule at 162, J.A. 727. EPA reasonably relied on the Global Warming Potential score.
Third, Mexichem and Arkema suggest that EPA failed to provide objective benchmarks for determining • which substances’ Global Warming Potential scores were too high to -be acceptable. But EPA was not assessing the score of each individual substance in isolation. Instead, EPA was comparing substances with one another. EPA reasonably concluded that substances with higher scores posed a greater global warming risk than substances with lower scores. See, e.g., Final Rule, 80 Fed. Reg. at 42,882. That is a “comprehensible” and objective method for assessing environmental risks. Postal Service v. Postal Regulatory Commission, 785 F.3d 740, 753 (D.C. Cir. 2015).
Fourth, according to Mexichem and Arkema, EPA failed to consider data regarding the overall amount of each substitute that would be emitted into the atmosphere. Not so. EPA considered whether there were “substantial differences” between HFCs and other substitutes that “might affect total atmospheric emissions.”' Final Rule, 80 Fed. Reg. at 42,938. EPA also looked at other factors related to atmospheric emissions, “such as charge size of refrigeration equipment and total estimates of production,” as part of “its assessment of environmental and health risks of new alternatives.” Id. Because EPA accounted for factors that affect the quantity of emissions, EPA did not entirely fail to “consider an important aspect of the problem.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856.
Fifth, Mexichem and Arkema assert that EPA should have accounted for energy efficiency when assessing the atmospheric effects of HFCs. But as EPA explained, *464 the energy efficiency of a substance often is not informative in isolation. Final Rule, 80 Fed. Reg. at 42,921-22. The efficiency of the substance depends on the efficiency of the equipment in which the substance is used. In part because EPA cannot control the efficiency of equipment under Section 612(c), EPA decided not to evaluate the energy efficiency of substitutes in its analysis. Id. Under those circumstances, EPA’s approach was reasonable and reasonably explained.
Sixth, Mexichem and Arkema argue that EPA should have placed conditions on how HFCs could be used, rather than entirely prohibiting certain uses of HFCs. But EPA adequately explained that use controls are typically appropriate when a particular use of a substance carries an especially high risk that can be mitigated by placing conditions on that use. Id. at 42,-899. Use controls would not be appropriate for HFCs, EPA stated, because the hazards of HFCs are not unique to particular uses. Instead, “the environmental risks” from HFCs “are due to the collective global impact of refrigerant emissions released over time.” Id. EPA also explained that use controls for HF.Cs did not make sense because-other substitutes are readily available. Id. That conclusion is reasonable and reasonably explained for purposes of arbitrary and- capricious review under the Administrative Procedure Act.
Seventh, Mexichem and Arkema claim that EPA failed to consider' transition costs—that is, the costs of transitioning from prohibited HFCs to approved substitutes. But EPA did take transition costs into account when it decided to give certain product manufacturers extra time to comply with the Rule. See, e.g., id. at 42,933. EPA acted reasonably for purposes of arbitrary and capricious review.
⅜ ⅜ ⅜ •
In sum, we grant the petitions and vacate the 2015 Rule to the extent it requires manufacturers to replace HFCs with a substitute substance. We remand to EPA for further proceedings consistent with this opinion. We reject all of Mexichem and Arkema’s other challenges to the 2015 Rule. The petitions are therefore granted in part and denied in part.

So ordered,

. Although we focus primarily on product manufacturers in this case, our interpretation of Section 612(c) applies to any regulated parties that must replace ozone-depleting substances within the timelines specified by Title ..VI. See, e.g., 42 U.S.C. §§ 7671c, 7671d. -

. The parties disagree over whether, as a factual matter, any manufacturers still make products that use ozone-depleting substances. EPA says yes. Mexichem and Arkema say no. We need not resolve that factual dispute here, as it has no bearing on our legal analysis of the meaning of Section 612(c).

. During oral argument, EPA conceded that it had never previously moved a non-ozone-depleting substance from the list of safe substitutes to the list of prohibited substitutes. Counsel for EPA stated: “I believe it is correct that the prior de-listings have involved ozone depleting substitutes, and I may not be correct for that, but we can assume for this morning that that is correct.” Tr. of Oral Arg. at 14. Since the time of oral argument, EPÁ has not made any filings to this Court to retract that concession.

. The dissenting opinion says that the word "replace” may mean "to provide a substitute for,” rather than "to take the place of.” Dissenting Op. at 466, 467. But the dissenting opinion’s alternative interpretation of the word "replace” suffers from the same flaw as • EPA's interpretation. A manufacturer “provides a substitute for” an ozone-depleting sub- . stance in a product when the manufacturer transitions to making that product with a substitute -substance. After that transition takes place, the manufacturer can no longer "provide a substitute for” an ozone-depleting substance. At that point, there is no ozone-depleting substance to “provide a substitute for.” Therefore, even under the dissenting opinion’s interpretation, a manufacturer cannot "replace” an ozone-depleting substance after the manufacturer stops using that substance.

. To be sure, Mexichem and Arkema argue that EPA acted arbitrarily and capriciously in removing HFCs from the list of safe substitutes. As explained in Part III below, however, we reject that argument. We conclude that EPA acted lawfully in removing HFCs from the list of safe substitutes.

. We take no position now on whether EPA can meet those requirements. Moreover, we • note that those three requirements would be necessary for EPA to prevail on a “retroactive disapproval” theory. We do not opine here on whether they would be sufficient.

. Mexichem and Arkema also assert that EPA's decision to change the listing status of HFCs violated EPA's regulations because EPA did not compare HFCs to the proper comparator substances. See 40 C.F.R. §§ 82.170(a), 82.172. That is not accurate. In the 2015 Rule, EPA compared HFCs with other substances that are on EPA’s list of safe substitutes, as EPA is permitted to do under its regulations. See id. § 82.170(a); Final Rule, 80 Fed. Reg. at 42,937.