(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BLANCHE, ACTING ATTORNEY GENERAL *v.* LAU

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 25–429. Argued April 22, 2026—Decided June 23, 2026

Under the Immigration and Nationality Act (INA), the Government can remove aliens applying for admission to the country if they are "'inadmissible,'" and it can remove aliens already admitted if they are "'deportable.'" *Campos-Chaves* v. *Garland*, 602 U. S. 447, 451. In this case, respondent Muk Choi Lau, a Chinese citizen, was admitted to the United States as a lawful permanent resident in 2007. On May 7, 2012, New Jersey charged Lau with trademark counterfeiting. While awaiting trial, Lau temporarily left the United States for China. On June 15, 2012, Lau attempted to reenter the United States by presenting himself to a border officer at the airport. Lawful permanent residents generally must be regarded as already admitted to the country and usually do not have to reapply for admission when they return from temporary overseas travel. 8 U. S. C. §1101(a)(13)(C). Under an exception, the Government may regard a lawful permanent resident as "seeking an admission" (and thus as not already admitted) if he "has committed an offense identified in section 1182(a)(2)," §1101(a)(13)(C)(v), including a crime involving moral turpitude, §1182(a)(2)(A)(i)(I). Because of Lau's pending criminal charge, the border officer did not regard Lau as already admitted, but instead paroled him pending the resolution of his criminal case, meaning that Lau was allowed to physically enter the country without being formally admitted. After Lau pleaded guilty to his trademark-counterfeiting charge on June 24, 2013, the Government initiated removal proceedings against him. At those proceedings, the Government charged Lau as an applicant for admission who was inadmissible for having been convicted of a crime involving moral turpitude. Lau argued that he was a lawful permanent resident already admitted and subject to removal

only on deportability grounds. 130 F. 4th 42, 44. The Immigration
Judge found Lau removable as charged, and the Board of Immigration
Appeals affirmed. Lau sought review in the Second Circuit, which va-
cated the removal order. It concluded that Lau should have been re-
garded as already admitted upon arrival unless the border officer had
"clear and convincing" evidence that Lau had committed the crime,
which it held that the officer lacked. *Id.*, at 46. Without that evidence,
the court concluded, border officers must regard lawful permanent res-
idents as already admitted, which precludes removal on inadmissibil-
ity grounds. The court remanded to the agency without prejudice to
the Government's ability to charge Lau with deportability. Because
the Second Circuit's decision conflicted with those of the Fifth and
Ninth Circuits, the Court granted certiorari.

*Held*: The Immigration and Nationality Act (INA) does not require a bor-
der officer to have clear and convincing evidence that a lawful perma-
nent resident has committed a crime involving moral turpitude before
deeming the resident an applicant for admission. Pp. 5–9.

(a) Removing a lawful permanent resident on a charge of inadmissi-
bility involves two steps: at step one, only commission of the crime is
required to show that the alien could be regarded as seeking to be ad-
mitted; at step two, conviction or admission is required to show that
the alien seeking to be admitted is inadmissible. Lau was correctly
charged with inadmissibility. At step one, the Government regarded
him as an alien seeking admission because he had committed a crime
involving moral turpitude before attempting to reenter the country. At
step two, he was inadmissible and therefore removable because he had
been convicted of a crime involving moral turpitude.

The Second Circuit resisted this straightforward analysis based on
a conclusion that the Government had the burden "to prove by clear
and convincing evidence that [Lau] actually committed the crime in
question *at the time of reentry*." 140 F. 4th, at 47 (emphasis added).
The statute imposes similar burdens in other situations, but nothing
in the INA says that the Government has the burden to establish by
clear and convincing evidence that the alien is an applicant for admis-
sion. The Second Circuit derived its clear-and-convincing-evidence re-
quirement not from the statutory text, but from inapposite Board of
Immigration Appeals precedent. Correct or not, the Board imposes
this burden on the Government only "*at the time of the removal hear-
ing*," not at the border. *Matter of Valenzuela-Felix*, 26 I. & N. Dec. 53,
57, 64. Here, the Government satisfied its burden at the hearing: Lau's
guilty plea was clear and convincing evidence that, before he at-
tempted to reenter the country, he had committed the crime in ques-
tion. The Court declines to read into the INA an additional clear-and-
convincing-evidence burden on border officers entrusted with making

Syllabus

"quick judgments on the spot" when that burden is nowhere in the statute or even Board precedent. *Luz Munoz* v. *Holder*, 755 F. 3d 366, 371. Pp. 5–7.

(b) Lau's remaining arguments lack merit. Lau argues that the same clear-and-convincing-evidence standard that the Board applies during the removal proceeding should apply to the border officers determining that an applicant is seeking an admission. But nothing in the INA supports that argument.

Lau also suggests that a lawful permanent resident may be regarded as seeking admission only after being *convicted* of a crime involving moral turpitude, citing this Court's footnoted dictum in *Vartelas* v. *Holder*, 566 U. S. 257, 275, n. 11. A straightforward reading of the statutory text contradicts Lau's interpretation. Section 1101(a)(13)(C)(v) says that a lawful permanent resident may "be regarded as seeking an admission" if he "has committed" a crime identified in §1182(a)(2), which includes "a crime involving moral turpitude." §1182(a)(2)(A)(i)(I). Under §1101(a)(13)(C)(v), the Government may regard a lawful permanent resident as seeking admission as soon as he "*committed* a" crime involving moral turpitude "even if (as in [Lau's] case) the *conviction* occurred" later. *Barton* v. *Barr*, 590 U. S. 220, 232. Section 1101(a)(13)(C)(v) incorporates by reference only the crimes §1182(a)(2) identifies, not its requirement of conviction. Pp. 7–9.

(c) The Court does not decide whether Lau's crime was one involving moral turpitude, but remands the case to the Second Circuit for further proceedings. P. 9.

130 F. 4th 42, vacated and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————

No. 25–429

————

## TODD BLANCHE, ACTING ATTORNEY GENERAL, PETITIONER *v.* MUK CHOI LAU

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2026]

JUSTICE THOMAS delivered the opinion of the Court.

Respondent Muk Choi Lau, a Chinese citizen, became a lawful permanent resident in 2007. New Jersey charged him with a crime in 2012. He then temporarily left the United States. Ordinarily, a lawful permanent resident who arrives in the United States after a temporary absence does not have to apply for admission because he is regarded as already admitted. 8 U. S. C. §1101(a)(13)(C). If he has committed certain crimes, however, the Government may regard him as not yet admitted. §1101(a)(13)(C)(v). Because of Lau's pending charge for a crime, a border officer declined to regard Lau as admitted upon his return and did not admit him at the border. Instead, the officer paroled him pending the resolution of his criminal case, meaning that he was allowed to physically enter the country without being formally admitted. After Lau pleaded guilty to the New Jersey charge, the Government initiated removal proceedings and secured a removal order based on his conviction. The Board of Immigration Appeals affirmed.

The United States Court of Appeals for the Second Circuit vacated the removal order. It concluded that Lau

should have been regarded as already admitted upon arrival unless the border officer had "clear and convincing" evidence that Lau had committed the crime, which it held that the officer lacked. *Muk Choi Lau* v. *Bondi,* 130 F. 4th 42, 46 (2025). Because the Immigration and Nationality Act (INA) does not impose that requirement, we vacate the Second Circuit's judgment.

## I
### A

The Government can remove aliens on different grounds depending on whether they have been formally admitted to the country. It can remove aliens applying for admission if they are "'inadmissible,'" and it can remove already admitted aliens if they are "'deportable.'" *Campos-Chaves* v. *Garland*, 602 U. S. 447, 451 (2024). The INA specifies the respective grounds of inadmissibility and deportability with which the Government can charge an alien. §§1182(a), 1227(a). As relevant here, the Government can charge an alien applicant for admission as inadmissible if he has been "convicted of . . . a crime involving moral turpitude" at any time. §1182(a)(2)(A)(i)(I). By contrast, the Government can charge an already admitted alien as deportable if he has been "convicted of a crime involving moral turpitude" only if that crime was "committed within five years . . . after the date of admission." §1227(a)(2)(A)(i).

Because lawful permanent residents generally must be regarded as already admitted to the country, they usually do not have to reapply for admission when they return from temporary overseas travel. §1101(a)(13)(C). But, under an exception central to this case, the Government may regard a lawful permanent resident as "seeking an admission" (and thus as not already admitted) if he "has committed an offense identified in section 1182(a)(2)," §1101(a)(13)(C)(v), including a crime involving moral turpitude, §1182(a)(2)(A)(i)(I).

When the Government institutes removal proceedings against an alien, the INA imposes various burdens of proof on the alien and the Government. See §§1229a(c)(2), (3). But, it does not specify whether the Government has the burden to establish that the alien is an applicant for admission in the first place, as opposed to someone already admitted.

## B

Lau is a Chinese citizen. He was admitted to the United States as a lawful permanent resident in 2007, making him a "noncitizen who is authorized to live permanently in the United States." *Barton* v. *Barr*, 590 U. S. 222, 227 (2020). On May 7, 2012, New Jersey charged Lau with trademark counterfeiting. While awaiting trial, Lau temporarily left the United States for China. On June 15, 2012, Lau attempted to reenter the United States by presenting himself to a border officer at John F. Kennedy International Airport. Because of his pending criminal charge, the officer did not regard Lau as already admitted, but instead as an applicant seeking admission.

The border officer did not immediately decide whether Lau was ultimately admissible. The INA allows the Government to parole certain aliens seeking admission instead of formally admitting them, detaining them, or removing them. §1182(d)(5)(A). Parole allows an alien to physically enter the United States without being admitted. *Ibid.*; see also §1101(a)(13)(B). Parole thus allows the Government to pause the inspection at the border and defer it to a later time without having to detain the alien pending a final admissibility decision, as would otherwise be required. §§1225(a), (b)(2)(A); *Jennings* v. *Rodriguez*, 583 U. S. 281, 300 (2018). The Government exercised that authority to parole Lau pending the resolution of his criminal case, instead of formally deeming him admitted.

### C

After Lau pleaded guilty to his trademark-counterfeiting charge on June 24, 2013, the Government initiated removal proceedings against him on March 13, 2014. At those proceedings, the Government charged Lau as an applicant for admission who was inadmissible for having been convicted of a crime involving moral turpitude. See §1182(a)(2)(A)(i)(I). Lau sought to terminate the proceedings on the ground that the Government improperly classified him as an applicant "seeking admission" when he returned from his trip abroad, instead of deeming him already admitted as a lawful permanent resident and subject to removal only on deportability grounds. 130 F. 4th, at 44 (internal quotation marks omitted). Lau also argued that his conviction was not of a crime involving moral turpitude, but that issue is not before the Court because the Second Circuit did not reach it. *Id.*, at 44, 46. Thus, for purposes of this opinion, we assume without deciding that Lau's conviction was of a crime involving moral turpitude.

The Immigration Judge found Lau removable as charged, and the Board of Immigration Appeals affirmed the removal order. It held that the Government had proved by clear and convincing evidence that Lau fell within the exception for lawful permanent residents who had committed a crime involving moral turpitude and that he was inadmissible and removable based on his conviction.

### D

Lau sought review in the Second Circuit, which vacated the removal order. The court acknowledged that a lawful permanent resident may be regarded as seeking admission after he has committed a crime involving moral turpitude, even if he has not yet been convicted. But, according to the Second Circuit, it is not enough that the lawful permanent resident committed a crime involving moral turpitude; the Government needed "clear and convincing evidence," at the

border, that he committed the crime. *Id.*, at 47. Without that evidence, the court said, border officers must regard lawful permanent residents as already admitted, which precludes removal on inadmissibility grounds. Because, in its view, the criminal charge alone did not give the border officer clear and convincing evidence that Lau committed the crime, the court concluded that Lau was not properly paroled, that he should instead have been deemed admitted, and that he therefore could not be charged with inadmissibility. The court remanded to the agency with instructions to terminate removal proceedings based on inadmissibility without prejudice to the Government's ability to charge Lau with deportability.

Because the Second Circuit's decision conflicted with those of the Fifth and Ninth Circuits, see *Luz Munoz* v. *Holder*, 755 F. 3d 366, 370 (CA5 2014); *Vazquez Romero* v. *Garland*, 999 F. 3d 656, 664 (CA9 2021), we granted certiorari, 607 U. S. 1120 (2026).

## II

The Government correctly regarded Lau as an applicant for admission, so it properly charged him with inadmissibility. Nothing in the INA required the border officer to have clear and convincing evidence that Lau had committed a crime involving moral turpitude before deeming him an applicant for admission.

## A

A lawful permanent resident who has "committed an offense identified in section 1182(a)(2)" may "be regarded as seeking an admission." §1101(a)(13)(C)(v). Section 1182(a)(2), in turn, identifies any "crime involving moral turpitude." §1182(a)(2)(A)(i)(I). Putting the provisions together, if a lawful permanent resident has committed a crime involving moral turpitude, he may be regarded as seeking admission. And, because he is seeking admission,

he "may be charged with any applicable ground of inadmissibility under section 1182(a)," §1229a(a)(2), including being convicted of or admitting to "a crime involving moral turpitude," §1182(a)(2)(A)(i)(I).

Removing a lawful permanent resident on a charge of inadmissibility thus involves two steps: "[W]hile only commission [of the crime] is required at step one" (to show that the alien could be regarded as seeking to be admitted), "conviction (or admission) is required at step two" (to show that the alien seeking to be admitted is inadmissible). *Barton*, 590 U. S., at 233 (internal quotation marks omitted).

Under these rules, Lau was correctly charged with inadmissibility. At step one, the Government properly regarded him as an alien seeking admission because he had committed a crime involving moral turpitude before attempting to reenter the country. See *Luz Munoz*, 755 F. 3d, at 370. So, at step two, he was inadmissible and therefore removable if he satisfied any statutory ground for inadmissibility, including that he had been convicted of a crime involving moral turpitude. See §1229a(e)(2)(A).

### B

The Second Circuit resisted that straightforward analysis. In its view, at step one, the Government had the burden "to prove by clear and convincing evidence that [Lau] actually committed the crime in question *at the time of reentry*." 130 F. 4th, at 47 (emphasis added). We disagree.

Nothing in the INA imposes the burden that the Second Circuit recognized. The statute imposes similar burdens in other situations, but not in this one. It imposes the burden on the applicant for admission to prove that he is admissible. §1229a(c)(2)(A). It imposes the burden on an alien seeking to prove that he was previously admitted. §1229a(c)(2)(B). It imposes the burden on the Government to prove that an already-admitted alien is deportable. §1229a(c)(3)(A). But, it nowhere says that the Government

has the burden to establish by clear and convincing evidence that the alien is an applicant for admission.[1]

The Second Circuit derived its clear-and-convincing-evidence requirement not from the statutory text, but from inapposite Board of Immigration Appeals precedent. The Board says that the Government must establish that a lawful permanent resident is an applicant for admission by clear and convincing evidence. App. to Pet. for Cert. 23a. But, the Board imposes this burden on the Government, correctly or not, only "*at the time of the removal hearing*," not at the border. *Matter of Valenzuela-Felix*, 26 I. & N. Dec. 53, 57, 64 (BIA 2012).[2] And, here, the Government satisfied its burden at the hearing based "on the evidence produced at the hearing," §1229a(c)(1)(A): Lau's guilty plea was clear and convincing evidence that, before he attempted to reenter the country, he had committed the crime in question. We decline to read into the INA an additional clear-and-convincing-evidence burden on border officers entrusted with making "quick judgments on the spot" when that burden is nowhere in the statute or even Board precedent. *Luz Munoz*, 755 F. 3d, at 371.

———————

[1] The dissent does not dispute that the INA nowhere imposes the Second Circuit's clear-and-convincing-evidence border requirement. *Post*, at 11–12 (opinion of JACKSON, J.). It asserts that there is a "requisite certainty" that the Government must have at the border, but even after looking to "the text of the statute" it fails to tell us where the dissent's requirement is to be found. *Post*, at 3.

[2] The Board's holding that the Government bears the burden to establish that the alien is an applicant for admission is not before the Court, so we do not decide whether it is correct. See Brief for Petitioner 16. The Government suggests that, if there were any burden at the border, it would be for "the arriving individual to establish facts 'to the satisfaction of the inspecting officer'" "relevant to determining the person's status." Reply Brief 11–12; see also Tr. of Oral Arg. 19. Because we reject the Second Circuit's conclusion that border officers had to have clear and convincing evidence of Lau's crime, we need not decide that issue.

C

We also disagree with Lau's remaining arguments.

Lau argues that border officers had to determine that he was "seeking an admission" based on some standard, §1101(a)(13)(C); accord, 130 F. 4th, at 49; *post*, at 2, 4–5 (JACKSON, J., dissenting), and that the same clear-and-convincing-evidence standard that the Board applies at the removal proceeding should apply for both purposes. Brief for Respondent 14–15, 31. But, as the Government points out, border "officers *did* determine that he was seeking an admission" when they paroled him. Reply Brief 2. And, as we have already explained, there is nothing in the INA that suggests that those officers had to have clear and convincing evidence to do so at that time. Lau argues that the Government "expressly" conceded that it had that burden. Brief for Respondent 15, 18. But, the Government conceded that it had the burden only "in *removal proceedings*," not at the border. Brief for Petitioner 16 (emphasis added); Reply Brief 3.

Lau also suggests that the Second Circuit did not go far enough: A lawful permanent resident may be regarded as seeking admission, he argues, only after being *convicted* of a crime involving moral turpitude. Brief for Respondent 31, 45–46; see also Brief for Immigration Law Professors as *Amici Curiae* 9; but see 130 F. 4th, at 47 (rejecting this argument). He cites this Court's footnoted dictum that the phrase "committed an offense identified in section 1182(a)(2)," §1101(a)(13)(C)(v), "appears to advert to a lawful permanent resident who has been convicted of an offense under §1182(a)(2) (or admits to one)," *Vartelas* v. *Holder*, 566 U. S. 257, 275, n. 11 (2012). Brief for Respondent 31, 45.

A straightforward reading of the text contradicts Lau's interpretation. Accord, *post*, at 12–13 (JACKSON, J., dissenting). Section 1101(a)(13)(C)(v) says that a lawful per-

manent resident may "be regarded as seeking an admission" if he "has committed" a crime identified in §1182(a)(2). Section 1182(a)(2), in turn, identifies certain types of crimes. One is "a crime involving moral turpitude." §1182(a)(2)(A)(i)(I). So, under §1101(a)(13)(C)(v), the Government may regard a lawful permanent resident as seeking admission as soon as he "*committed* a" crime involving moral turpitude "even if (as in [Lau's] case) the *conviction* occurred" later. *Barton*, 590 U. S., at 232.

To be sure, an alien's ultimate inadmissibility under §1182(a)(2) turns on whether the alien is *convicted* of an identified crime. But, §1101(a)(13)(C)(v), by its express terms, incorporates by reference only the crimes §1182(a)(2) identifies, not its requirement of conviction. Read together in that way, the provisions make good sense: "An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission . . . unless the alien . . . has committed," §1101(a)(13)(C)(v), "a crime involving moral turpitude," §1182(a)(2)(A)(i)(I). Read together in the way that Lau suggests, the provisions make little sense: "An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission . . . unless the alien . . . has committed," §1101(a)(13)(C)(v), a "convict[ion]" of "a crime involving moral turpitude," §1182(a)(2)(A)(i)(I). One does not commit a conviction.

## III

We conclude that the Government properly charged Lau with inadmissibility. Border officers did not have the burden to establish by clear and convincing evidence that Lau had committed a crime involving moral turpitude. Because Lau still argues that his crime was not one involving moral turpitude and we do not decide that issue, we vacate the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 25–429

———————

## TODD BLANCHE, ACTING ATTORNEY GENERAL, PETITIONER *v.* MUK CHOI LAU

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2026]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

Lawful permanent residents (LPRs)—also known as green card holders—have special status in the U. S. immigration system. They are authorized to live and work permanently in the United States (as the name suggests), are eligible for certain federal benefits, and can contribute money to political campaigns. As relevant here, LPRs can also travel in and out of the United States more easily than other noncitizens. This is because, when an LPR returns to the United States after an international trip, border officers are required by statute to treat an LPR as already admitted unless one of six exceptions applies. See 8 U. S. C. §1101(a)(13)(C).

One of those exceptions—the focus of today's case—applies when the returning LPR "has committed an offense" involving moral turpitude. §1101(a)(13)(C)(v); see §1182(a)(2). If that statutory provision or any of the other listed exceptions is applicable to an LPR returning from abroad, the LPR can be divested of his already-admitted status and treated as if he is "seeking an admission" instead. §1101(a)(13)(C). An LPR who is deemed to be "seeking an admission" rather than already admitted can be turned away, detained, or conditionally let back into the country on parole. §1182(d)(5)(A). And being paroled often

goes hand in hand with confiscation of the LPR's physical green card (the official document designating the individual as an LPR), thrusting the LPR into a state of uncertainty about his immigration status, his future, and his access to the protections the immigration system affords him.

This case is about whether the Government must determine that one of the six statutory exceptions applies *before* divesting a returning LPR of his already-admitted status. Given the statutory scheme I have just outlined, to ask this question is to answer it: The Government must, of course, make *some* determination about the applicability of one of the statutory exceptions before an LPR can be deemed "seeking an admission" and paroled back into the country. But today the Court allows the Government to deem an LPR to be "seeking an admission" first and justify the applicability of an exception later—undermining the statutory scheme as well as the benefits and security that come with having a green card. I respectfully dissent because the governing law's text, structure, and context show that the majority's view cannot possibly be what Congress intended.

I

Though this isn't clear from the majority's opinion, the only question this case presents is one of *sequencing*: Must the Government determine whether an LPR "has committed" a crime involving moral turpitude, §1101(a)(13)(C)(v), *before* refusing to deem him already admitted at the border? The majority responds in the negative. The Court now relieves the Government of its statutory burden to determine the applicability of an exception at the border if the Government "satisfie[s] its burden *at the [removal] hearing* based on the evidence" it accrues by the time of the hearing. *Ante*, at 7 (emphasis added; internal quotation marks omitted).[1]

———————

[1] In a footnote, the majority hedges that it "do[es] not decide whether" the Government must satisfy "any burden at the border," and gestures

But under the plain terms of the statute, the removal hearing—which can come months, or even years, after the LPR is demoted to "seeking an admission" status and paroled in—is too late for the Government to carry its burden. The Government needs to have the requisite certainty about the applicability of the crime-involving-moral-turpitude exception *at the border,* before it decides that the statute's default requirement for admission of LPRs does not apply.

### A

Start with the text of the statute. The Immigration and Nationality Act (INA) plainly provides a default rule regarding the Government's admission of an LPR returning home from travels abroad. Unlike other noncitizens, an LPR "shall not be regarded as seeking an admission into the United States." §1101(a)(13)(C) (emphasis added). This is a clear directive. In practical terms, it means that a border officer "shall not" require an LPR to (re)prove that he satisfies the standard admission criteria upon his return to the United States.[2]

The default rule requiring LPRs to be deemed already admitted gives way in only six circumstances specified in the statute. The border officer may regard an LPR as "seeking an admission" if the LPR "has abandoned or relinquished" his LPR status; "has been absent from the United States for a continuous period in excess of 180 days"; "has engaged in illegal activity after having departed the United States"; "has departed from the United States while" removal

––––––––––

at the Government's alternative position that, *if* it bears any such burden, the correct standard would be "to the satisfaction of the inspecting officer." *Ante*, at 7, n. 2 (internal quotation marks omitted). It is hard to square this purported disclaimer with the Court's holding, which is that all is fine here because the Government "satisfied its burden at the [removal] hearing based on the evidence produced at the hearing." *Ante,* at 7 (internal quotation marks omitted).

[2] This is why, for example, LPRs are often processed alongside U. S. citizens at ports of entry.

proceedings are pending; "has committed" a crime involving moral turpitude or a qualifying drug offense; or "is attempting to enter at a time or place other than as designated by immigration officers."  §§1101(a)(13)(C)(i)–(vi).[3]

1

Knowing just what I have already explained about the statutory scheme is enough to answer the question presented in this case.  Congress's use of the phrase "shall not" leaves the Government no discretion to divest an LPR of his already-admitted status and treat him as "seeking an admission" if he does not fit into one of the six exceptions.  See §1101(a)(13)(C); *Maine Community Health Options* v. *United States*, 590 U. S. 296, 310 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement" (some internal quotation marks omitted)).

In other words, as the Second Circuit correctly observed, §1101(a)(13)(C) is "unmistakably clear that the default presumption is that LPRs will *not* be treated as seeking admission *unless* certain threshold determinations have been made." *Muk Choi Lau* v. *Bondi*, 130 F. 4th 42, 49 (2025) (case below).  So, as a matter of logic, the statute is "definitive on the question of sequence: [The border officer] must determine whether an LPR is an applicant for admission as a threshold matter before [he] is authorized" not to admit that LPR.  *Ibid.* (emphasis deleted).  It really is that simple.

––––––––––

[3] In the case before us, a border officer deemed Lau to be "seeking an admission" based on the penultimate exception—*i.e.*, on the ground that he had committed a crime involving moral turpitude.  But at the time of entry, Lau had not yet been convicted of the then-pending charge for selling counterfeit clothes in New Jersey, and instead testified at a border interview that he "did not know exactly what was contained in the boxes that [he] stored in the" warehouse.  App. 16.  At a removal hearing years later, an Immigration Judge nevertheless held that the Government had properly deemed Lau to be "seeking an admission" on the basis of a conviction entered *after* he had been so deemed.

Critical here (and elided in the majority's reasoning) is the distinction between the border officer's initial decision whether an LPR should be classified as "seeking an admission" and an immigration judge's later decision, at the removal hearing, whether the LPR is ultimately admissible. The admissibility determination comes *after* the LPR is deemed to be "seeking an admission." But the Court's analysis conflates these two distinct determinations. It thereby allows the Government to "satisf[y] its burden" for the initial decision (which, logically, must happen at the border) with later-accrued evidence, *i.e.*, backfill its justification. *Ante*, at 7. For the reasons I have just laid out, that conclusion cannot be squared with §1101(a)(13)(C)'s core mandate directing the Government *not to* "regar[d an LPR] as seeking an admission into the United States."[4]

### 2

For additional confirmation of the Government's burden at the border, one need only look to the rest of §1101(a)(13)(C). Congress's use of the present-perfect tense in five of the six exceptions (including the one at issue here) shows that the statute was written for use by border officers. It is the border officer, not the immigration judge, who is tasked with making the determination whether to

———————

[4] In *Matter of Valenzuela-Felix*, 26 I. & N. Dec. 53 (BIA 2012), the Board of Immigration Appeals (BIA) likewise held that the Government's burden to prove that an LPR is "seeking an admission" applies at the removal hearing (when admissibility is determined), rather than at the border. The BIA reasoned that the "Immigration Judge's attempt to decide the admissibility issue at the time [the LPR] was initially stopped at the border is at odds with the well-established immigration practice that treats an application for admission as a continuing one." *Id.*, at 59. The problem with this analysis is that, at the border, the inquiry cannot (yet) be about "inadmissibility" since there is not yet any "application for admission." The inquiry at the border goes instead to whether the LPR must be deemed already admitted or is "seeking an admission" in the first place. This Court should have abrogated, rather than endorsed, this fundamentally flawed decision. See *ante,* at 7.

classify a returning LPR as already admitted or as "seeking an admission." The relevant statutory questions are directed to the border officer: whether the LPR before him "*has* abandoned or relinquished" his LPR status, "*has* been absent from the United States for a continuous period in excess of 180 days," "*has* engaged in illegal activity after having departed the United States," "*has* departed from the United States" pending removal proceedings, or, as relevant here, "*has* committed" a crime of moral turpitude. §§1101(a)(13)(C)(i)–(v) (emphases added). By contrast, the immigration judge, looking retrospectively from a later post-entry point in the timeline, would consider whether the LPR *had* so relinquished, been absent, engaged in illegal activity, departed, or committed a qualifying crime by the time of entry. See *ante*, at 6 (noting Lau "*had* committed a crime involving moral turpitude *before* attempting to reenter the country" (emphasis added)).

"[T]he present-perfect tense conveys to a listener that the event in question continues to be true or valid." *Hewitt* v. *United States*, 606 U. S. 419, 429 (2025). It makes sense that the border officer would ask what "has" transpired with respect to a returning LPR when deciding whether that individual should be treated as already admitted or "seeking an admission." By contrast, it would not make sense for the immigration judge to consider, for example, whether the LPR "has departed" the United States, §1101(a)(13)(C)(iv); by the time of the removal hearing, the LPR is back inside the country. Similarly, why would an immigration judge consider whether the LPR "*has* been absent . . . in excess of 180 days" by the time of the removal hearing when, by then, the LPR will already have returned to the United States? What matters under §1101(a)(13)(C)(ii) is how long the LPR has been outside the United States before arriving at the border, not before his

removal hearing.[5]  Section 1101(a)(13)(C) thus governs the border officer's analysis at the time of the LPR's entry, rather than the immigration judge's analysis at the removal hearing.

One may still wonder, what is the big deal if the applicable exception is established later based on evidence the Government gathers after the fact?  Sure, Lau was deemed to be "seeking an admission" at the border, but ultimately, that did not prevent him from physically entering the country.  To so reason reflects a basic misunderstanding of the nature of the determination that a border officer makes under §1101(a)(13)(C).

When the INA says that an LPR "shall not be regarded as seeking an admission into the United States . . . unless" one of the six exceptions applies, *ibid.*, it refers to the border officer's determination of *status*, first and foremost.  The default status of an LPR is that he is already admitted; but under the specified circumstances, a border officer could demote him to the status of "seeking an admission," rendering him vulnerable to removal proceedings and the insecurity and indeterminacy that come with having to face such proceedings in the future.  It is only *after* the border officer makes the status determination that he then separately decides whether to turn back, detain, or parole (*i.e.*, let in) the demoted LPR.  Put differently, at the border, the officer must first classify a returning LPR as already admitted or "seeking an admission," and *that* determination, in turn,

————————
[5] The same logic applies to the sixth exception, though it departs from the present-perfect formulation.  That exception allows the border officer to treat a returning LPR as applying for admission if he "*is attempting* to enter at a time or place other than as designated by immigration officers."  §1101(a)(13)(C)(vi) (emphasis added).  The present participle in that provision refers to an event "in progress," B. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 86 (2016), that, in this case, begins and ends at the border.  As Lau explains, "[a] person cannot [still] be 'attempting' to enter the country if he has already entered," as would be the case by the time of the removal hearing.  Brief for Respondent 24.

governs the process by which the LPR may (or may not) be let back into the country.

Understanding how this scheme works helps illuminate a critical fact: The decision whether an exception applies under §1101(a)(13)(C)—which establishes the LPR's status as already admitted or "seeking an admission"—must happen *at the border*, before an LPR is even given permission to cross the threshold and enter the United States.

### B

So far, I have shown that the majority's view makes no sense under the plain terms and mechanics of this statutory scheme. In the worst-case scenario under today's holding, the Government could merely *assume* at the border that any one of the six exceptions applies to an LPR (without any evidence) and prove the applicability of the statutory downgrade at a later removal hearing, using evidence accrued in the meantime. The majority's view also cannot be how Congress—the same one that took care to protect an LPR's already-admitted status at the border—meant for this to work. A demotion to the status of "seeking an admission" is not costless. Quite to the contrary, it comes with significant deprivations.

First of all, an LPR who is classified as "seeking an admission" may be immediately detained or paroled. See §1226(a) (providing that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); §1182(d)(5)(A) (authorizing the Government to parole "alien[s] applying for admission to the United States"). The downsides of detention are obvious. But even when an LPR is paroled—and thus allowed to enter the United States without being admitted, see §1182(d)(5)(A); *ante*, at 3—serious negative repercussions flow from an LPR's being deemed to be "seeking an admission."

The facts of this case exemplify this. When Lau was paroled as an LPR "seeking an admission," border officers confiscated his I–551, his permanent green card. In its stead, they issued him an I–94 Arrival/Departure Card bearing only handwritten information and a stapled photograph, and offering no indication of his LPR status other than a barely legible stamp and the form code "I–551" scribbled on the empty side of the card. See App. 6. That piece of paper has been Lau's only proof of his LPR status for the past 14 years, while Lau remained in immigration limbo following the Government's decision to classify him as "seeking an admission" at the border.[6]

As several *amici* explain, having only a temporary green card makes it harder to work, open bank accounts, secure housing, obtain health insurance, and enroll in school. Brief for Asian American Legal Defense and Education Fund et al. as *Amici Curiae* 14. For example, the Government instructs employers to treat I–94s with I–551 stamps (like the card Lau received) as short-term "receipts" of authorization to work rather than proof of permanent status. That receipt is valid for only "1 year after the issuance date if the stamp does not contain an expiration date."[7] After that, the LPR is required to "provide their permanent resident card."[8] So an LPR in Lau's position could lose his ability to work within a year of being paroled, and without the security of a permanent green card, could then face the downstream consequences of being unemployed and unemployable for however long the legal limbo continues.

––––––––––

[6] Paroled LPRs can be kept in legal limbo for as long as the Government chooses. In Lau's case, the Government did not issue a notice to appear—the document that kicks off removal proceedings—until around two years after Lau was paroled into the United States. See App. 25–27.

[7] U. S. Citizenship & Immigration Service, Form I–9 Acceptable Documents–Receipts (Oct. 16, 2024), https://www.uscis.gov/i-9-central/form-i-9-acceptable-documents/receipts (archived at https://perma.cc/94CT-WR8Q).

[8] *Ibid.*

Second, being regarded as "seeking an admission" exposes an LPR to inadmissibility proceedings, which are less favorable to LPRs than deportation proceedings. Once an LPR is deemed already admitted—pursuant to the default rule that applies when he returns home after a trip abroad—if the Government wishes to expel the LPR, its only option is to initiate deportation proceedings. See §1227. In such proceedings, it is the Government, not the LPR, that bears the burden of proving deportability. See 8 CFR §1240.8(a) (2025). But if an LPR is deemed to be "seeking an admission," and is therefore detained or paroled, the Government may initiate removal proceedings on the ground that the LPR is inadmissible. And in those proceedings, the *LPR* carries the burden of defeating the inadmissibility charge. See 8 U. S. C. §1229a(c)(2)(A). Thus, even affording the Government the presumption of good faith, see *INS* v. *Miranda*, 459 U. S. 14, 18 (1982) (*per curiam*), it is in the Government's interest to parole LPRs, rather than deem them admitted, when in doubt. And that self-interest cannot go unchecked, lest it "nullif[y Congress's] clear command" to deem LPRs already admitted unless the specified exceptions are met. 130 F. 4th, at 49.

The majority's contrary view rests on a misguided view of §1101(a)(13)(C). According to the majority, Congress provided LPRs with a default claim to already-admitted status at the border with one hand, while snatching away that entitlement with the other by enabling the Government to override it with impunity. Such an interpretation mistakenly allows the statutory exceptions to swallow the default rule. And it devalues an LPR's "weighty" rights "to stay and live and work in this land of freedom" and to rejoin her family in the United States. *Landon* v. *Plasencia*, 459 U. S. 21, 32–34 (1982) (internal quotation marks omitted).

II

So how did the majority reach today's counterintuitive and consequential result? By ignoring the "shall not" language in §1101(a)(13)(C). (Indeed, those words do not appear in the majority opinion until the very last page. See *ante*, at 9.) But the words of a statute convey intended meaning. See *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982). And nothing about the text or purpose of §1101(a)(13)(C) supports the majority's or the Government's reading.

A

Consider the textual points. First, the majority insists that the INA "nowhere" places the "burden" on the Government to establish "that the alien is an applicant for admission." *Ante*, at 6–7. This assertion is truly puzzling—what about §1101(a)(13)(C) itself? Under that section, which is the linchpin of this case, a returning LPR "shall not be regarded as seeking an admission into the United States" *unless* an exception applies. As I have explained, this means that the Government's default obligation is to deem the LPR already admitted; it must prove against that default in order to be able to do otherwise. If that's not a burden, nothing is.

Perhaps the majority's view is that, even assuming the Government carries a burden at the border, the burden might be something other than "clear and convincing evidence." See *ante,* at 7, n. 2. Indeed, the courts of appeals have varied on the proper standard. The Third Circuit, for example, has embraced a lower, "probable cause" standard. *Doe* v. *Attorney General*, 659 F. 3d 266, 272 (2011).

But doubt about the burden's substance is no reason to jettison the duty altogether. As the Government itself stressed at the certiorari stage, it "is not challenging" here (and did not challenge below) "the clear and convincing standard." Pet. for Cert. Reply Brief 11. Instead, "[t]his

case is about *when* the [G]overnment must carry that bur-
den." *Ibid.*[9] So if the Court's decision today is driven by
any uncertainty regarding the *level* of burden that applies,
see *ante,* 7, n. 1, it could have (properly) concluded that the
Government has a burden at the border and remanded the
matter for consideration of the contours of that burden.

The majority also maintains that the fact that
§1101(a)(13)(C)(v) says "committed" (rather than "con-
victed," for instance) means that the Government "may re-
gard [an LPR] as seeking admission as soon as he '*commit-
ted* a' crime involving moral turpitude 'even if (as in [Lau's]
case) the *conviction* occurred' later." *Ante*, at 9 (quoting
*Barton* v. *Barr*, 590 U. S. 222, 232 (2020)). Fair enough. I
acknowledge that a conviction is not the only basis upon
which a border officer could determine that an LPR has
committed a qualifying crime. But that does not solve the
majority's sequencing problem. The border officer still
must determine that an LPR "has committed" a crime in-
volving moral turpitude. And that determination must be

_____

[9] At the Second Circuit below, the Government urged adoption only of
the BIA's view in *Matter of Valenzuela-Felix*, which was that the Govern-
ment need not prove that an LPR qualifies as "seeking an admission"
until the removal hearing. See n. 4, *supra.* The Government mentioned
the Third Circuit's position but did not advocate that view even in the
alternative. If anything, the Government suggested that the Third Cir-
cuit was wrong. See Brief for United States in *Muk Choi Lau* v. *Garland*,
No. 21–6623 (CA2), pp. 51–52.

Before us, the Government again picks its battles. It disputes only the
sequence, urging us to hold that the Government must satisfy the "clear
and convincing evidence" standard *at the removal hearing*, rather than
at the border. See Brief for Petitioner 14–23. The Government's passing
invocation in its reply of a brand-new "to the satisfaction of the inspect-
ing officer" standard as well as the Third Circuit's "probable cause"
standard is too little, too late. Reply Brief 11–12 (internal quotation
marks omitted); *Pasquantino* v. *United States*, 544 U. S. 349, 371, n. 12
(2005) (declining to consider an argument that "was not pressed or
passed upon below and was raised only as an afterthought in petitioners'
reply brief ").

based on something—be it a confession, a credibility determination based on the border interview, a conviction, or otherwise. Moreover, as I have now said repeatedly, that determination must be made *before* the border officer can demote an LPR to "seeking an admission" status and parole him back into the country.

*Barton* (see *ante,* at 9) is not to the contrary. There, the Court considered a provision of the INA that established "strict eligibility requirements" for cancellation of removal. 590 U. S., at 225. Under that provision, §1229b(a), a noncitizen "who is inadmissible or deportable" may receive cancellation of removal and adjustment of status if he "has resided in the United States continuously for 7 years after having been admitted in any status" and "has not been convicted of" a qualifying offense. We held that a noncitizen who committed a qualifying crime during the 7-year period was ineligible for cancellation of removal even though he was convicted "after the seven years elapsed." *Id.*, at 232.

Right or wrong, that holding has no bearing here. The question whether a noncitizen is eligible for cancellation of removal follows a finding of removability or deportability. See *ibid.* ("Under the cancellation-of-removal statute, immigration judges must . . . determine whether, *after* a previously admitted noncitizen has been determined to be deportable, the noncitizen should nonetheless be allowed to remain in the United States" (emphasis added)). So, by the time §1229b(a) kicks in, the propriety of the removability or deportability finding must be taken for granted. By contrast, a border officer performing his duties under §1101(a)(13)(C) is deciding whether a returning LPR will be treated as "seeking an admission"—a necessary step *before* a removal hearing is set to decide that individual's removability. That an LPR subsequently commits a crime or is later convicted for criminal behavior (after he comes back into the country) does not and cannot logically bear on the correctness of the border officer's classification.

Finally, the Government and the majority maintain that the INA restricts the immigration judge's review of the border officer's classification to only "the evidence produced at the hearing," which they interpret to include evidence accrued *after* the border officer's parole decision. *Ante*, at 7 (citing §1229a(c)(1)(A)). It is puzzling to think that this language—which appears in a section that has nothing to do with the Government's obligations regarding LPRs at the border—would allow the Government to rely on postparole evidence to prove that it had authority to parole. Section 1229a(c)(1)(A) is about what the immigration judge can consider in determining inadmissibility, not whether an LPR should be at a removal proceeding in the first place. And in any case, that provision is clearly meant to prohibit immigration judges from considering material extraneous to the hearing (*e.g.*, broader world events, stereotypes, and cultural assumptions), not to expand the range of permissible evidence to *post hoc* justifications of the border officer's parole decision.

## B

That leaves the Government's policy argument. The Government asserts that holding it to a burden of proof at the time of an LPR's reentry would force border officers to conduct minitrials and clog up immigration processing at the border. See Brief for Petitioner 36–38; Tr. of Oral Arg. 27–28. This argument, too, is without merit.

My view of §1101(a)(13)(C) would not require the border officer and the LPR to litigate the merits of any pending criminal charges at the border. Often, as here, an LPR will not challenge a border officer's decision to deem him to be "seeking an admission" until the removal hearing. In such circumstances, the dispute regarding whether the LPR satisfied the exception at the time he was paroled will unfold in front of the immigration judge, whose task will be to determine, in retrospect, whether the border officer's decision

was lawful.  The practical delta between my view and the majority's is that I do not agree that the Government can proffer *post hoc* evidence—such as the LPR's subsequent conviction—to support the determination the border officer made when the LPR returned from his travels.  Keeping to the most natural reading of §1101(a)(13)(C) would not cause a breakdown in border processing; rather, it would incentivize border officers to take care to remain within the bounds of their statutory authority.

Indeed, the Government nowhere disputes that border officers have already been conducting these kinds of inquiries during the customs process, with none of the problems the Government imagines.  As the record in this case reflects, see App. 13–19, immigration officers "have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien . . . to . . . reenter . . . the United States"—including, presumably, about any pending criminal charges.  §1225(d)(3).[10]  And the officers are well equipped to do so: They have access to databases from international, federal, state, and local law enforcement agencies.  Those resources would easily allow a border officer to discover that an LPR was "convicted of an offense" or, in the absence of a conviction, observe an LPR "admi[t] to one."  *Vartelas* v. *Holder*, 566 U. S. 257, 275, n. 11 (2012).[11]

---

[10] See also U. S. Customs and Border Protection, Immigration Inspection Program (May 1, 2026), https://www.cbp.gov/border-security/ports-entry/immigration-inspection-program          (archived          at https://perma.cc/Z86N-Z2X6).

[11] The Government's suggestion that the border officer must go further—*i.e.*, that the officer would need to conduct a minitrial of the LPR based on the pending criminal charges—is mistaken.  Whatever the proper standard, the border officer is answering the same basic question: Does *the evidence before him* show that the LPR "has committed" a crime of moral turpitude?  Nothing in the statute requires the border officer to go scavenging for evidence beyond what is available to him at the border.

The Congress that crafted §1101(a)(13)(C) did not share the Government's anxieties about the detrimental impact that making this determination would have on processing immigrants at the border. Quite to the contrary, it anticipated that border officers would be "able to determine *from the information supplied by the alien* whether he falls within the 'criminal' category of excludables, notwithstanding the fact that there may be no record of conviction or admission of the commission of a specific offense." H. R. Rep. No. 1365, 82d Cong., 2d Sess., 48 (1952) (emphasis added). If the Government feels this assessment is outdated, "its . . . recourse lies in Congress, not in the courts where litigants are generally entitled to expect that statutes will 'be enforced as written.'" *Feliciano* v. *Department of Transp.*, 605 U. S. 38, 54 (2025) (citing *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 525 (2018)).

### III

Applying the proper sequencing under §1101(a)(13)(C) to the facts at hand—and assuming (without taking a view) that the applicable standard is "clear and convincing evidence," see n. 9, *supra*—I agree with the Second Circuit that the Government failed to carry its burden to establish, at the time the border officer made the parole decision, that Lau had committed a crime involving moral turpitude.

Lau took a short trip to China after he was charged with—but not yet convicted of—selling counterfeit Coogi shorts in New Jersey. The parties agree that, upon his return home, Lau was divested of his already-admitted status, deemed an applicant for admission, and paroled solely on the basis of the indictment. The border officers had neither a conviction nor a confession, and they did not have any evidence to rebut Lau's sworn statements that he "did not know exactly what was contained in the boxes that [he]

––––––––––
Congress did not shift criminal adjudication to the border when it enacted §1101(a)(13)(C)(v).

stored in the" warehouse. App. 16. It is a fundamental maxim in our country that all are innocent until proven guilty. Lau's indictment alone was insufficient to establish by "clear and convincing evidence" that he had already "committed" a crime involving moral turpitude.

\*    \*    \*

I worry that the Court has now handed the Government a massive blank check. With today's decision, the Court allows the Government to return an LPR to the status of "seeking an admission" upon his entry at the border, so long as the Government is able to show later that he was eventually convicted. That sequencing undermines the plain terms and basic operation of the relevant statutory scheme, which guarantees that LPRs will not be "regarded as seeking an admission" at the border unless certain exceptions apply. §1101(a)(13)(C).

To be sure, if the paroled LPR ends up being acquitted, the Government's eventual effort to remove him on this basis will fail (insofar as the charge of removability was based only on the qualifying offense). But that is likely cold comfort to the LPR, who by then might have spent years in legal limbo (with only the protection of a temporary green card) or worse, in detention.

Having enshrined a returning LPR's already-admitted status, Congress could not have meant for the guarantees it was affording to be so cavalierly swept aside. By law, LPRs are as close to citizenship as one can get absent naturalization. Cf. *Hellenic Lines Ltd.* v. *Rhoditis*, 398 U. S. 306, 309–310 (1970) ("We extend to [LPRs] the same constitutional protections of due process that we accord citizens" (citing *Kwong Hai Chew* v. *Colding*, 344 U. S. 590, 596 (1953)). Today, the majority ignores that crucial fact and empowers Government officials to act accordingly.